RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0038p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HENRY IRVING RAMER (15-6014 & 15-6402); JOHN G. WESTINE, JR. (16-5356),

*Defendants-Appellants.*

Nos. 15-6014/6402/16-5356

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 3:14-cr-00010—Gregory F. Van Tatenhove, District Judge.

Argued: December 6, 2017

Decided and Filed: February 26, 2018

Before: CLAY, GIBBONS, and BUSH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David J. Guarnieri, MCBRAYER MCGINNIS, LESLIE & KIRKLAND, PLLC, Lexington, Kentucky, for Appellant in 15-6014 and 15-6402. Kevin M. Schad, FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 16-5356. David B. Goodhand, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** David J. Guarnieri, MCBRAYER MCGINNIS, LESLIE & KIRKLAND, PLLC, Lexington, Kentucky, for Appellant in 15-6014 and 15-6402. Kevin M. Schad, FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 16-5356. David B. Goodhand, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Kenneth Taylor, Neeraj K. Gupta, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.   Defendants John Westine and Henry Ramer ("Defendants") appeal their convictions and sentences in their criminal cases involving charges of mail fraud, in violation of 18 U.S.C. § 1341; money laundering, in violation of 18 U.S.C. § 1956; and securities fraud, in violation of 15 U.S.C. § 78j(b).   Defendants were convicted in separate jury trials.   For the reasons set forth below, we **AFFIRM** both convictions and both sentences.

**BACKGROUND**

**Factual History**

This case involves a group of individuals who schemed to defraud investors through the marketing of a series of spurious oil and gas drilling projects.   Prosecutors indicted several individuals in connection with the scheme, including Defendants.   The evidence presented at Defendants' trials supports the following timeline of events.

In October 2011, Defendant Westine completed a 235-month sentence following his conviction for securities fraud, whereupon he returned to his home in California.   The crime that led to this prior term of imprisonment involved the sale of fraudulent Kentucky oil and gas interests as well as non-existent shares of crude oil from Saudi Arabia.   Investors knew Westine by his aliases, John Scott and Michael Fairchild.   Westine operated through a company he called TriState Development, and he hired a sales team that worked out of a Los Angeles call center.

Less than a year after Westine was released from prison, he began offering investments in Kentucky oil wells through three companies:   Liberty Oil Leasing, Three Star Leasing, and Clementsville Oil & Gas Leasing.   The companies published promotional materials claiming that their wells were currently producing oil and would generate a steady stream of royalty payments.   These promotional materials highlighted the leadership of "John Scott," a "long-time oil and gas operator" (R. 357 at PageID #3415), and the companies rented virtual office space in Kentucky under the names Michael Fairchild and Michael Ross.   Prospective investors were promised that

they would receive their "[f]irst monthly check within 90 days." (R. 357 at PageID #3414.) The government refers to the operations of these three companies as "Phase I" of the fraud.

When investors never received royalty checks from the Phase I companies, they began filing complaints with the Kentucky Department of Financial Institutions ("DFI"). DFI investigators concluded that the companies were selling unlawful securities. DFI's investigation culminated in the issuance of a restraining order that, among other things, prohibited the individuals affiliated with the companies from "making offers to sell and selling interests in oil and gas programs." (GEX 57 at 2.)

By this point, Defendant Westine had recruited Defendant Ramer as a partner in his scheme. Together, Defendants began winding down the Phase I companies' operations and transitioning them to three new companies—the start of what the government calls "Phase II." Over the course of the following year, Royal Leasing of Tennessee, Royal Energy of Tennessee, and Royal Energy LLC collected over $2 million from 138 investors. When these investors complained about not receiving royalty payments, "Michael Ross" reassured them, blaming "freakish weather" for delays, telling them he had multiple wells generating 15–20 barrels of oil per day, and promising that checks were forthcoming. (R. 358 at PageID #3934–35, 3948, 3990.) But none of this was true, and investors never received the promised checks.

Meanwhile, Defendant Ramer recruited new investors and persuaded existing investors to double down, sometimes even after they complained. To find new recruits, he oversaw two call centers in California and developed a promotional video that boasted a fictional production capacity of 75 barrels per day. Ramer helped Westine keep track of his many aliases, tutoring him on which identity to use during at least one meeting with Ramer's call center sales staff. For existing investors, Ramer organized a trip so that they could "see[] the oil wells" and "smell[] the oil." (R. 358 at PageID #3945–46; R. 473 at PageID #6005; R. 474 at PageID #6203.) On this trip, Ramer introduced investors to a third co-conspirator, Mark Cornell, who provided a tour of his JMack Energy oil facility. In reality, this facility was capable of producing only a small amount of oil—nowhere near 75 barrels per day—but it served to create an appearance of legitimacy. During the tour, Cornell even gave the investors jars of oil, purportedly produced by JMack Energy.

Not all the investors were placated. In mid-2014, investor complaints again started to weigh on Defendants. Defendants began to wind down the Phase II companies and to shift operations to a new company called Marathon Leasing. Defendant Ramer also proposed that they form a company called Midwest Leasing "so . . . there will not be a link to Marathon or Royal." (GEX 501; *see* R.476 at PageID #6753–54.) During a period of less than two months, which prosecutors referred to as "Phase III," Defendants collected $242,233 from twelve investors. But before Defendants could fully transition from Phase II to Phase III, prosecutors had Defendant Westine arrested. Upon learning of the arrest, Defendant Ramer directed his associates to "take [out] as much money" as possible from the corporate accounts and send it to him. (R. 356 at PageID #3277; R. 237 at Page ID #1301–02; GEX 371 (audio recording); R.450 at PageID #5507.) Ramer's arrest followed shortly thereafter.

## Procedural History

On October 9, 2014, the government indicted two individuals in connection with the scheme, including Defendant Westine. A superseding indictment named additional individuals, including Defendant Ramer. The superseding indictment charged Defendants with 29 counts of mail fraud, in violation of 18 U.S.C. § 1341; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); securities fraud, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; and three forfeiture allegations.

Defendants were tried separately. The government presented overwhelming evidence implicating both Defendants in the scheme, including extensive testimony from oil and gas experts, victims, co-conspirators, and federal investigators. At the conclusion of each trial, a jury found each Defendant guilty of multiple counts of mail fraud, conspiracy to commit money laundering, and securities fraud. The district court sentenced Defendant Westine to 480 months' imprisonment and Defendant Ramer to 156 months' imprisonment.

The government also obtained a conviction for co-conspirator Mark Cornell. In connection with Cornell's sentencing, which took place after Defendants' sentencing, the government submitted evidence that Cornell had conducted a separate criminal securities fraud scheme. The government described a "side deal" that resembled the one for which Cornell,

Westine, and Ramer were indicted, but which Cornell conducted on his own.  (R. 496 at PageID #7352–57.)  An independent team of state investigators discovered Cornell's scheme based on a web page he created to recruit investors.

On September 3, 2015, Ramer filed a Motion for New Trial "pursuant to *Brady v. Maryland* evidence or, in the alternative, newly discovered evidence pursuant to F.R.C.P. 33." (R. 388 at l.)  Westine, who represented himself through the trial, filed several motions that the district court construed as also requesting a new trial.  The district court concluded that neither Defendant was entitled to a new trial and denied their motions.

Defendants then filed timely appeals, raising numerous challenges to the trial proceedings.  We address each of their challenges in turn.

## DISCUSSION

## I. PRIOR ACTS EVIDENCE

The government's theory of mail fraud involved allegations that both Defendants failed to disclose material facts to prospective investors, including that Defendant Westine had been convicted in 1992 for "conducting essentially the same oil production scam" and that Defendant Ramer was "the subject[] of state regulatory cease and desist orders for selling unregistered securities."  (R. 51 at PageID #217–18.)  The district court permitted the introduction of prior acts evidence showing that Defendant Westine had indeed been convicted for the fraudulent sale of oil and gas interests.  The court also permitted the jury to learn of regulatory actions in California and Arizona that directed Defendant Ramer to cease and desist the sale of unregistered securities.

The government also alleged that Defendants made affirmative misrepresentations to investors regarding the production capacity of their oil wells and the corresponding returns on investment.  In their defense, Defendants largely focused on the knowledge and intent elements of mail fraud; they asserted that they were not sophisticated enough to recognize or understand that the representations they made to investors were false or misleading.  Westine also disputed that he used aliases such as Michael Fairchild and John Scott.  In response to these defenses, and

over Defendants' objections, the district court permitted the government to introduce additional details regarding Defendant Westine's previous fraud conviction (such as his use of the aliases Michael Fairchild and John Scott) as well as the California cease and desist letter directed to Defendant Ramer. Defendants now argue that all prior acts evidence should have been excluded.

This court reviews evidentiary rulings for abuse of discretion. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007); *see United States v. Churn*, 800 F.3d 768, 774–80 (6th Cir. 2015). Pursuant to Rule 404(b), "a court may admit evidence of a defendant's 'other' or 'similar' bad acts or crimes only if the evidence is probative of a relevant fact, and not to show the defendant's 'character' or 'propensity' to commit bad acts." *United States v. Mack*, 258 F.3d 548, 552–53 (6th Cir. 2001) (quoting *United States v. Clemis*, 11 F.3d 597, 600 (6th Cir. 1993)). Relevant facts include "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "To admit evidence under Rule 404(b), the trial court must follow three steps: (1) make a preliminary determination that enough evidence exists that the prior act actually occurred; (2) determine whether the other acts evidence is being offered for a proper purpose under Rule 404(b); and (3) determine whether the other acts evidence is more prejudicial than probative under Federal Rule of Evidence 403." *United States v. Thompson*, 690 F. App'x 302, 307 (6th Cir. 2017). Rule 403 states, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Defendants argue that the prior acts evidence was improperly offered to suggest a propensity for wrongdoing. But the record shows that the evidence was offered for a number of proper purposes. One such purpose was to prove Defendants' knowledge. To prove mail fraud, the government needed to show that "the scheme included a material misrepresentation or concealment of a material fact." Sixth Circuit Pattern Jury Instructions, *10.01 Mail Fraud (18 U.S.C. § 1341)*. The government alleged that Defendants concealed their prior conduct from investors and that the investors would have chosen not to invest if they had known the full truth. Because the facts of Defendants' prior conduct were the same facts that Defendants were alleged to have concealed from investors, the facts were relevant for purposes of Rule 404(b).

"A contrary ruling would place the government in the thoroughly untenable position of attempting to prove that [the defendants] failed to disclose material facts without allowing the government to demonstrate the existence of those facts." *United States v. Monea*, 129 F.3d 1266, 1997 WL 704935, at *2 (6th Cir. 1997) (per curiam) (unpublished).

Another proper purpose was to prove Defendants' intent. Defendants argued that they were merely "acting as part of the company" and that other individuals "made false promises that duped everyone." (Def. W. Br. 16; *see* Def. R. Br. 38.) The details of Defendants' prior acts evidence tended to prove that they were not so naive. Defendant Westine previously orchestrated a scheme selling fake oil and gas securities under a fake identity, and Defendant Ramer had previously been sanctioned in California for, as he describes it, "contact[ing] investors by telephone about purchasing fractional interests in oil and gas leases, which the California Department of Corporations (DCOC) deemed unregistered securities." (Def. R. Br. 37.) Defendants both knew about this information, and their deliberate effort to conceal it from investors severely undermines their credibility in telling the jury that they were just as surprised as their investors were to learn that the securities they sold were fraudulent.

Furthermore, the evidence was admissible for the proper purpose of proving Defendant Westine's identity. Evidence of prior acts is admissible for the purpose of proving identity when the act is so "unusual or distinctive as to be like a signature." *United States v. Woods*, 613 F.2d 629, 634–35 (6th Cir. 1980). The details of Westine's prior conviction show that he used the same aliases (John Scott and Michael Fairchild) and nearly the same techniques (fake companies, virtual offices, and California-based call centers) when perpetrating his previous fraud. These aliases and techniques are sufficiently distinctive to qualify as Westine's "signature" for purposes of Rule 404(b).

Nevertheless, Defendants also argue that the evidence should have been excluded as unfairly prejudicial. Given the many proper purposes for which the prior acts evidence was admissible and highly probative, Defendants face a heavy burden to show, as they must, that the probative value of the evidence was substantially outweighed by the risk of unfair prejudice. *See* Fed. R. Evid. 403. Defendants' argument falls short. Defendants assert that the government repeatedly showcased the prior acts evidence and encouraged the jury to consider it as propensity

evidence when it asked witnesses questions along the following lines: "If you had known Henry Ramer had been sanctioned in California and Arizona for selling unregistered securities, would you have invested?" (Def. R. Br. at 30; *see* Def. W. Br. at 17–18.)  But these questions merely demonstrate the significance of Defendants' omissions to their investors and, by extension, the relevance of Defendants' prior acts.  Although admission of the prior acts evidence carried some risk of unfair prejudice, this risk was not amplified by the cited government conduct.

The district court also recognized a risk that jurors might consider the evidence for an improper purpose, and it abated this risk by instructing both juries to consider Defendants' prior acts only if the jurors "find the defendant did commit those [prior acts]" and only "as it relates to the government's claim on the defendant's intent, knowledge, identity, absence of mistake, or lack of accident."  (R. 195 at PageID #956; R. 306 at PageID #2854.)  The district court concluded that the probative value of this evidence, combined with its jury instruction, was sufficient to satisfy Rule 404(b),[1] and we are not persuaded that the district court abused its discretion in reaching this conclusion.

## II.  NEW TRIAL MOTIONS

Both Defendants appeal based on information that came to light during the sentencing of their co-conspirator Mark Cornell.  Cornell was charged in connection with the same oil securities scheme for which Defendants were also charged.  Cornell pleaded guilty, cooperated with the government's investigation, and agreed to testify against Defendants at trial.  Cornell's initial testimony downplayed his role in the scheme, potentially to the point of perjury.  Cornell initially testified that he was unaware of the fraud and that he merely served as Defendants' unwitting agent.  After his examination, the government obtained evidence that Cornell had knowingly embraced an active role in the scheme.  The government put Cornell back on the stand, treated him as a hostile witness, and obtained an admission that he had lied about his true level of involvement.

---

[1]The district court also concluded that the prior acts evidence was admissible at least in part as *res gestae*. Because we conclude that the evidence was admissible under Rule 404(b), we need not examine its admissibility as *res gestae*.

What the jury did not know—and what the government later disclosed during Cornell's sentencing—is that DFI was building a separate file on Cornell as the government's case unfolded. Cornell was operating a "little side deal"—essentially a smaller scale carbon copy of the oil securities scam that he operated with Defendants. (R. 497.) Indeed, Cornell had been using many of the same techniques and the same false documentation he used with Defendants, but he did so through his own company, JMack Energy. DFI's investigation of Cornell was conducted by an independent team of civil investigators. By the time of Defendant Westine's trial, these investigators had issued a cease-and-desist letter to Cornell regarding a web page that marketed unregistered securities. Whether the investigators at this point understood the interplay between this web page, the criminal investigation of Defendants, and Cornell's side deal is unclear, but the investigators knew enough to make the cease-and-desist letter available to the criminal division; the government turned the letter over to Defendant Westine as *Brady* material. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). By the time of Defendant Ramer's trial, which was four months later, civil investigators had received a complaint from an additional Cornell investor and pieced together that Cornell was running "some side deals." (R. 497 at PageID #7454.)

Both Defendants request a new trial under Rule 33, arguing that the Cornell file constitutes newly discovered evidence. Defendant Westine argues in the alternative that the Cornell file is *Brady* material that the government suppressed. This Court "review[s] the denial of a motion for new trial based on *Brady* violations or newly discovered evidence under an abuse of discretion standard." *United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005); *United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982). "However, the district court's determination as to the existence of a *Brady* violation is reviewed de novo." *United States v. Graham*, 484 F.3d 413, 416–17 (6th Cir. 2007).

To successfully obtain a new trial under either Rule 33 of the Federal Rules of Criminal Procedure or *Brady*, a criminal defendant must show that the undisclosed evidence would have affected the outcome of the original trial or affected his sentence. Under Rule 33 specifically, the defendant must show, among other things, that "the evidence . . . would likely produce an acquittal if the case were retried." *Barlow*, 693 F.2d at 966. Meanwhile, under the *Brady*

standard, a defendant must show, among other things, that the evidence was "material" to his conviction or sentence. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Jones v. Bagley*, 696 F.3d 475, 486 (6th Cir. 2012). Undisclosed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir. 1992). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The materiality inquiry involves weighing "the value of the undisclosed evidence relative to the other evidence produced by the state." *Eakes v. Sexton*, 592 F. App'x 422, 427 (6th Cir. 2014). "[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *Bales v. Bell*, 788 F.3d 568, 574 (6th Cir. 2015) (alteration in original) (internal quotation marks omitted); *see Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000).

Neither Defendant has made the showing required for remand. With regard to Defendant Westine, the district court found that the information from the civil division's file on Cornell was immaterial in light of overwhelming evidence of Westine's guilt and because the information is "plainly cumulative of the substantial evidence already establishing Cornell's history of fraud and deception." (R. 472 at PageID #5725.) We agree.

The district court articulated its rationale and provided a concise summary of the extensive inculpatory evidence presented to the jury regarding both Westine and Cornell:

> Although Westine argues the "newly discovered evidence shows that Mark Cornell had the intent to commit fraud," he overlooks the fact that Cornell's intent to commit fraud was never in dispute. In his testimony at Westine's trial, Cornell expressly admitted that he had been indicted as a co-conspirator in the scheme, that he intended to enter a guilty plea in the case, and that he had previously lied to investigators about his involvement in the fraud. [R. 360 at 101-105.] Moreover, the jury in Westine's trial was aware of Cornell's dishonesty not only

as a result of his guilty plea, but also as a result of his false testimony at trial.  The United States severely impeached his testimony after discovering an email exchange that flatly contradicted his previous statements on direct examination. [R. 361 at 74-92.]  As Westine himself emphasized in his closing argument, "Mark Cornell pled guilty ... and he lied, and he lied, and he lied." [R. 354 at 94.] Placed alongside this existing evidence, any additional information undermining Cornell's credibility is immaterial.  *See Robinson v. Mills*, 592 F.3d 730, 736 (6th Cir. 2010) ("Where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material."). . . .

Additionally, when measuring the impact this evidence might have had on the outcome of each Defendant's trial, this Court must situate that information beneath the weight of the evidence establishing the Defendants' guilt.  In the case of both Westine and Ramer, the United States provided a sweeping and exhaustive body of evidence demonstrating that both Defendants were guilty of the crimes charged.  Moreover, the majority of this evidence was wholly independent of Cornell's participation in the scheme.  Although the evidence adduced at trial is far too voluminous to recount in full, the following summary provides a snapshot of the evidence available to the jury prior to the Defendants' convictions.

At Westine's trial, the United States introduced abundant evidence showing that his fraudulent scheme commenced long before he ever met Cornell.  Throughout the time period identified by the United States as "Phase I," Westine had no association with Cornell.  During this period, Westine assured prospective investors that he had "dozens of wells" and announced a plan "to put 50 on line," yet made no attempt to describe the location of the wells or the ownership of the purported leases. [R. 362 at 13.]  Marni Gibson, an enforcement branch manager at DFI, testified that, "[f]rom all appearances," these 50 wells were "just made up." [R. 297 at 21.]  In July 2013, Westine distributed a sales script to employees in which he encouraged them to suggest the company had "been in business for over 25 years" and that investors should expect to "receive [their] first royalty check with[in) 60 days after filing." [*Id.* at 22.]  Also in July 2013, Westine sent an email to a victim promising a "300 barrel a day target before November," despite the absence of any evidence indicating that such a target was remotely reasonable. [*Id.* at 97.]  By October 2013—the month in which Cornell provided the production guarantee to investors—there were about "five pages of investments that had nothing to do with the 75 barrel a day promise of Mr. Cornell." [R. 359 at 160.]

The jury also heard evidence that Westine failed to inform investors he had recently served a 22-year prison sentence for devising a similar oil and gas investment scheme.  [R. 362 at 199.]  In an effort to prevent victims from

uncovering his criminal history, Westine used at least five aliases. [*Id.* at 204.] He sent "email after email" to victims in which he variously identified himself as John Scott, Michael Fairchild, Michael Ross, John Gorman, and Michael Hicks. [*Id.* at 207-08.] When an employee in his virtual office discovered that his name was John Westine, he fired her and replaced her with someone who was not yet aware of his identity. [R. 354 at 96.] Some of the fake names used in this scheme were the same names used in the previous oil and gas fraud for which Westine served the 22-year prison term. [R. 362 at 207.] Relatedly, the prosecution also demonstrated that Westine habitually "changed business locations when the heat and the law came down on him," and hid the existence of these business operations from his parole officer. [*Id.* at 210-11.]

Most importantly, the jury heard evidence confirming that it was Westine, not Cornell, who insisted on making the 75-barrel-a-day guarantee. [R. 361 at 74-92.] During Cornell's direct examination, the United States introduced an email exchange between Cornell and Westine, then operating under the aliases of Michael Fairchild and Michael Hicks. The emails showed that Cornell initially promised only to "produce what is producible" in the operating agreement. [R. 361 at 80.] Westine responded by threatening to "do the [lease] through another broker," suggesting that he was "not content" with Cornell's proposal. [*Id.* at 76.] He later encouraged Cornell to "tighten up the contract." [*Id.* at 80.] Westine finally told Cornell that, if he were willing to make the 75-barrel-a-day guarantee, he "might be willing to give [him] another shot." [*Id.* at 91.] Cornell ultimately agreed to provide the guarantee. [*Id.* at 92.] . . .

The foregoing evidence unmistakably supports the conclusion that Westine . . . [was] guilty of the crimes charged, irrespective of Cornell's contribution to the conspiracy.

(*Id.* at 5725–31.)

Defendant Westine's argument about the potential impact of the Cornell file ignores the strength of the case against him. He insists that the evidence from the civil division was "more than mere impeachment – it helped to prove the only defense raised . . . [and] would have been useful and persuasive to the jury." (Def. W. Br. 25.) Indeed, Defendant Westine's only defense at trial was that he was oblivious to a fraud that was designed and perpetrated by Cornell. Given the extensive evidence against Westine—especially that he began engaging in the fraudulent practices at issue "long before he ever met Cornell," and that he did so under the same aliases he had previously used in a similar scheme (with the exception of the new name Michael Ross)—we cannot conclude that there is any "reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different." *See Bagley*, 473 U.S. at 682.

Defendant Westine also argues that the government's *Brady* obligation created a duty for DFI's criminal prosecutors to learn of the civil division's file on Cornell. The government disputes that it had such a duty, suggesting that DFI's civil division fits the description of "other government agencies that have no involvement in the investigation or prosecution at issue." *See Goff v. Bagley*, 601 F.3d 445, 476 (6th Cir. 2010). We need not reach this issue, however, due to the immateriality of the evidence. *Strickler*, 527 U.S. at 281–82 (1999) (requiring proof of all three elements to bring a successful *Brady* claim).

Finally, and somewhat puzzlingly, Defendant Westine also argues that the district court improperly permitted the chief prosecutor in his case, AUSA Taylor, to act as both an advocate and a witness at the post-trial evidentiary hearing on the Cornell file. However, Defendant Westine waived this argument when, during the hearing, he "objected to any way of proceeding in which [AUSA Taylor] d[id] not testify." (R. 497 at PageID #7450–51.) Thus, Defendant Westine has not shown that he is entitled to a new trial.

Defendant Ramer similarly asserts that the newly discovered evidence would allow him to argue in a new trial that Cornell alone orchestrated the fraud. But the Cornell file is not likely to produce an acquittal or otherwise affect Defendant Ramer's proceedings because the evidence of his culpability, like that of Westine's culpability, is overwhelming. As the district court summarized:

> The United States presented . . . persuasive evidence at Ramer's trial. Critically, the jury read the same email exchange establishing that Westine, rather than Cornell, insisted upon the 75-barrel-a-day guarantee. [TR: Ramer Trial Day 5 at 51.] Moreover, although Ramer did not himself use aliases, the United States showed that Ramer was aware of both Westine's fake names and his criminal history, and facilitated the concealment of this information from the defrauded investors. [R. 450 at 70, 78.] One witness testified, for example, that Ramer referred to Westine as "Michael Ross" when he introduced the two. Further, Ramer failed to disclose to investors that he had also been sanctioned in two states for selling unregistered securities. [TR: Ramer Trial, Day 3 at 76.] Victims testified that, had they been aware of these prior sanctions, they never would have invested in the scheme. [*See, e.g., id.*]

Because Ramer led the sales force promoting his and Westine's fraudulent project, the Government also introduced substantial evidence showing that Ramer supervised the conspirators' deceptive marketing of the non-producing wells. Ramer appeared in videos distributed to victims in which he made demonstrably false statements indicating that the business had been in operation for many years, that he had a well-established relationship with the enlisted oil drillers, and that he had thoroughly investigated the potential outputs of the oil wells. [R. 450 at 71 .] Ramer claimed, for example, that Cornell and oil driller James Garmon were longtime associates of his, despite having recently met the two on the internet. [*Id.* at 73.] Further, the marketing materials provided to victims contained deceptive surveys of the Illinois Mining Basin designed to look like geological studies of the wells in which the victims had invested. Roberta Bottoms, an agent of the United States Postal Inspection Service, testified that her investigation revealed Ramer was "[a]bsolutely" involved in the editing of these brochures. [TR: Ramer Trial, Day 5 at 39.]

The prosecution further showed the jury that, when victims began to suspect their investments were worthless, Ramer assured them that profits were forthcoming. [TR: Evidentiary Hearing at 118.] The jury heard "a long list of...witnesses that came up and described their interaction with Henry Ramer, how when they expressed doubt and concern that they weren't getting their money, he lulled them, he reassured them and sold them on new investments to get their money back." [Id.] The United States noted that Ramer made these representations with full knowledge that "every other victim had lost their money." [*Id.*]

In addition to deceiving investors, evidence also established that Ramer lied to federal investigators. Bottoms testified that, following Westine's indictment, Ramer told her that he had called Hicks to inform him that they were "shutting things down" and "couldn't possibly keep things going after" learning of Westine's arrest. [TR: Ramer Trial, Day 5 at 24.] Recorded telephone conversations, however, proved the content of Ramer's conversation with Hicks was the "exact opposite of what he told [her] in the interview." [*Id.* at 25.] Rather than encourage Hicks to shut down the fraudulent operation, Ramer instead told him to "go to the bank, get all the money, [and] mail it to [him] by 3:00." [*Id.*] Ramer further declared "that they had to stay up and running, that he was in control, and they had to . . . put the money in (a different bank] account." [*Id.* at 24.]

The foregoing evidence unmistakably supports the conclusion that . . . Ramer w[as] guilty of the crimes charged, irrespective of Cornell's contribution to the conspiracy.

(R. 472 at PageID #5729–31.)

In light of this evidence against Defendant Ramer, the evidence that Mark Cornell was running a side deal is insufficient to warrant remand.

## III.  HEARSAY CHALLENGES

Defendant Westine argues that the following evidence introduced at trial was inadmissible hearsay:

(1) A document received in Defendants' virtual office in Kentucky and forwarded to Defendants in California, as read into the record by Defendants' Kentucky office administrator;

(2) Email correspondence between employees of a Phase II company questioning the company's legitimacy, as read into the record by a DFI investigator;

(3) Testimony of a Phase II company employee regarding angry statements made by investors;

(4) Prospectus issued by a Phase II company, as read into the record by a company employee;

(5) A Better Business Bureau complaint against a Phase II company and the company's response thereto, as read into the record by a company employee;

(6) Testimony by an accountant hired during Phase I regarding an interaction with a bank employee in which the accountant learned that a bank account she believed belonged to the company actually belonged to an individual named John Westine; and

(7) Testimony of a DFI investigator regarding his research demonstrating that company websites were created and owned by John Westine.

Complicating his appeal, however, is the fact that Defendant Westine did not object to any of the alleged hearsay at trial.  In fact, he elicited one of the challenged statements himself while cross-examining a witness.

When a party does not object at trial, this Court reviews hearsay objections for plain error.  *United States v. Lopez-Medina*, 461 F.3d 724, 746 (6th Cir. 2006); *see United States v. Olano*, 507 U.S. 725, 731 (1993).  Under the plain error standard, this Court has discretion to

remedy an error, but only upon a showing that the error is "clear or obvious, affect[s] a defendant's substantial rights, and seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Lopez-Medina*, 461 F.3d at 746; *see Olano*, 507 U.S. at 736.  The defendant has the burden of persuasion, and "[i]n most cases, a court of appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial." *Olano*, 507 U.S. at 734.

Defendant Westine fails to show any prejudice arising from the alleged hearsay.  In lieu of argumentation on this point, Defendant Westine merely states the following:

> When viewing each of these statements individually, their effect on the trial may have been slight.  However, taken together, the cumulative effect of the erroneous admission of this evidence denied Westine a fair trial.  "Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Robinson*, 357 Fed. App'x 677, 688 (6th Cir. 2009).  For these reasons, Westine's convictions must be vacated.

(Def. W. Br. at 30.)  This conclusory statement is unilluminating.  Nor is there any obvious reason to presume prejudice in the context of this trial, especially given that Defendant Westine elicited one of the challenged statements himself while conducting his cross-examination. *See United States v. Hanna*, 661 F.3d 271, 293 (6th Cir. 2011) (holding that an invited error does not warrant reversal); *United States v. Tandon*, 111 F.3d 482, 489 (6th Cir. 1997) (explaining that "an error introduced by the complaining party will cause reversal only in the most exceptional situation" (internal quotation marks and citation omitted)).  We therefore find that the introduction of the challenged evidence did not deny Defendant Westine the right to a fair trial.

## IV.  BANK RECORDS

Defendant Ramer argues that Government Exhibits 271–87 and 291–94 were inadmissible hearsay and that the district court erred when it permitted the exhibits to be introduced pursuant to the hearsay exception for business records:  Rule 803(6) of the Federal Rules of Evidence.  The exhibits at issue are records of corporate bank accounts that were

managed by Defendants Ramer and Westine.**2**    We find Defendant Ramer's argument unpersuasive.

The parties disagree as to whether admissibility decisions made by the district court pursuant to Rule 803(6) of the Federal Rules of Evidence are reviewed *de novo* or for abuse of discretion.  In *United States v. Collins*, 799 F.3d 554, 582 (6th Cir. 2015), this Court noted a "discrepancy" in its rulings on that subject but concluded that it "need not resolve this discrepancy since Defendants' challenge fails under either standard of review."  We arrive at the same conclusion in this case.

Rule 803(6) permits business records to be admitted into evidence despite the normal bar against the introduction of hearsay as long as four requirements are met:  (1) the records were "created in the course of a regularly conducted business activity;" (2) the records were "kept in the regular course of that business;" (3) the records resulted from a "regular practice of that business" to create such documents; and (4) the records were "created by a person with knowledge of the transaction or from information transmitted by a person with knowledge." *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1071–72 (6th Cir. 2014); Fed. R. Evid. 803(6).  The fulfillment of these conditions must be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification."  Fed. R. Evid. 803(6)(D).  Once these conditions have been shown to be satisfied, another party may challenge the veracity of the business records by showing "that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6)(E).

Defendant Ramer's argument is foreclosed by the logic of this Court's ruling in *United States v. Coffman*, 574 F. App'x 541, 556 (6th Cir. 2014).  In that case, we affirmed the introduction of similar bank records and bank record summaries, explaining that qualified investigators can authenticate such documents:

---

**2**Exhibits 271–87 are the bank records themselves, and Exhibits 291–94 are summaries of those records. Defendant Ramer's challenge under Rule 803(6) applies to both sets of exhibits because the summary evidence (Exhibits 291–94) is admissible only if the underlying bank records (Exhibits 271–87) are admissible.  *See* Fed. R. Evid. 1006; *Auto Indus. Supplier Emp. Stock Ownership Plan v. Ford Motor Co.*, 435 F. App'x 430, 448 (6th Cir. 2011).

[The defendant] argues that the district court erred when it admitted thousands of pages of bank records documenting [the defendant]'s money transfers because they were not properly authenticated under Federal Rule of Evidence 803(6). At trial, Government witnesses testified that they used the bank records to create consolidated charts and documents outlining the flow of money into and out of Mid-America and Global bank accounts. . . .

Business records may be admissible if the records are properly authenticated. Fed.R.Evid. 803(6). . . . [D]ocuments may be authenticated . . . using a "custodian or other qualified witness." Fed.R.Evid. 803(6)(D). Regarding that provision, we have said: "there is no reason why a proper foundation for application of Rule 803(6) cannot be laid, in part or in whole, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted. When a witness is used to lay the foundation for admitting records under Rule 803(6), all that is required is that the witness be familiar with the record keeping system."

Witnesses, including Assistant United States Attorney Lisa Hasday and Ryan Lee, a United States Postal Service analyst, testified to the authenticity of the records. Hasday testified that using account numbers from investors' deposited checks, she subpoenaed bank records for a given time period. This testimony evinces a familiarity with the record keeping system of the banks. Lee's testimony described the process for obtaining those bank records, demonstrating that he was familiar with the record keeping system of the banks. And the admitted documents had the appearance of bank records, and some of them contained Coffman's name and signature. The district court did not abuse its discretion in admitting the bank records.

*Id.* (citing *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986)).

In this case, DFI witness Gibson was qualified to authenticate the bank records because she demonstrated a similar familiarity with bank recordkeeping systems. Gibson explained a painstaking process by which she examined investors' checks, drafted subpoenas to obtain bank records associated with those checks, identified the accounts used by Defendants, issued more subpoenas, and repeated the process until she thought she had "built the entire picture." (*See* R. 475 at PageID #6374–77.) Gibson further explained that she worked to compile Government Exhibits 271–87 and 291–94, challenged here, which together depict an enterprise spanning more than 20 different bank accounts and millions of dollars of contributions from hundreds of unique investors. Gibson had a strong understanding of the records at issue and was a qualified

witness for purposes of Rule 803(6). She also provided a sufficient description of the recordkeeping process to properly authenticate the evidence for trial.

Defendant Ramer challenges Gibson's qualification because she is a "non-bank employee." (Def. R. Br. 17.) In other words, Defendant Ramer suggests that the government was required to lay a foundation for the bank records by obtaining sworn testimony from an employee of each bank involved with Defendants' sprawling network of accounts. This Court has not previously found that Rule 803 imposes such a burden on prosecutors or on the trial court; indeed, "all that is required is that the witness be *familiar* with the record keeping system." *Coffman*, 574 F. App'x at 556 (citing *Hathaway*, 798 F.2d at 906) (emphasis added). Finding that Gibson was qualified and further finding no basis to question the trustworthiness of the bank records, we conclude that the district court did not err or abuse its discretion in its evidentiary determination.

## V. EXPERT TESTIMONY

Defendant Ramer argues that the district court erred by admitting the expert testimony of Marvin Combs. Although Defendant Ramer objected at trial to Combs' testimony, he did not specifically object on the ground raised in this appeal. Below, his objections were that (1) Combs was not qualified to serve as an expert due to insufficient education and experience, and (2) that Combs' "testimony is not relevant to the instant prosecution." (R. 273 at PageID #2295.) His current argument is that the production reports supporting Combs' testimony were unreliable because they were self-reported by individual oil well operators in Kentucky. In preparation for trial, Defendant Ramer did not challenge the self-reported nature of the production reports. To the contrary, he stated the following:

> I think if the court determines the witness is qualified by education and experience and the court determines it's relevant, . . . *I think he can comment on his belief as to the veracity or the propriety of the representations that the operator was making.* But I think to carry it one step further and go through analysis in carrying the pro forma with the representations, that's argument for counsel, that's not for the person from the Division -- he doesn't do that.

(R. 450 at PageID #5360–61 (emphasis added).) Defendant Ramer therefore forfeited this argument. *See United States v. Murphy*, 241 F.3d 447, 451 (6th Cir. 2001) (holding that

defendant forfeited argument on appeal by failing to raise argument with specificity); *United States v. Buchanon,* 72 F.3d 1217, 1226–27 (6th Cir. 1995) (same).

Because Defendant Ramer forfeited this argument below, this Court's review is limited to the plain error standard. *See United States v. Reed*, 167 F.3d 984, 988–89 (6th Cir. 1999) ("The 'plain error' rule also applies to a case, such as this, in which a party objects to [an evidentiary determination] on specific grounds in the trial court, but on appeal the party asserts new grounds challenging [that determination]." (quoting *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989)) (alterations in original)).

Properly qualified expert testimony is admissible where it is "based on sufficient facts or data." Fed. R. Evid. 702(b). "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. "Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993). Rather, the testimony should be admitted, and any remaining challenges merely go to the weight, as opposed to the admissibility, of the expert testimony. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008).

Defendant Ramer argues that Combs' testimony should have been excluded because self-reported data reports are inherently unreliable. He argues:

> By Combs' own admission, these production reports for wells in southcentral Kentucky, as well as the oil wells involved with this case, are based upon information provided by operators, not findings of [government] inspectors. Furthermore, [the government] does not verify the information provided by these operators whatsoever. Finally, the records only go back to the early 1990's, and the wells in question last operated in the 1980's.

(Def. R. Br. at 22.)

We find no clear or obvious reason to treat expert testimony based on decades of self-reported oil well production reports as "mere guess or speculation." *See L.E. Cooke Co.*, 991 F.2d at 342 (explaining that admissible expert opinions often rely on some degree of speculation). Combs' testimony has a reasonable factual basis:  decades of self-reported data

from numerous sources, as well as Combs' lengthy experience in the field. Defendant Ramer suggests that the reports would be more reliable if they were compiled by government "inspectors," but he offers no evidence that such inspectors exist or that oil well production data are unreliable in the absence of such inspectors. *See Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000) (explaining that "experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion"). Gesturing to a theoretical source of better data is not enough to overcome the deference owed to the district court's judgment of the foundation for expert testimony, particularly when reviewing for clear error. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002).

## VI. PHASE I EVIDENCE

At trial, the parties disputed when exactly Defendant Ramer joined the criminal enterprise that led to his indictment. The parties also disputed Defendant Ramer's intent and knowledge of the criminal nature of the enterprise. The parties referred to three distinct phases of the enterprise, with each phase based on a different set of companies that were used to interact with investors. Ultimately, the jury convicted Defendant Ramer on twenty-one out of twenty-six counts of mail fraud, all of which corresponded to Phases II and III.

Defendant Ramer objected when the government attempted to introduce evidence pertaining to Phase I. He argued that he was not involved at all during Phase I, asking, "[W]hy are we talking about Phase I? Phase I . . . is June 2012 to September 2013. . . . Phase I took place prior to Henry Ramer's involvement." (R. 450 at PageID #5364.) The government disagreed, arguing that it would "have proof in this case that Mr. Ramer was involved in June of 2012." (R. 450 at PageID #5365.) The government's theory was that Defendant Ramer was involved from the beginning of Phase I and merely increased his presence during Phases II and III. The government also argued that the Phase I evidence was necessary in order to explain that the enterprise that Defendant Ramer joined—regardless of when he did so—was fraudulent. The district court ruled for the government, permitting Phase I evidence to be introduced at Defendant Ramer's trial, and Ramer now appeals on the basis that this evidence was irrelevant

and "presented with one purpose in mind, to taint the jury's perception of Phase II & III." (Def. R. Br. 44.)

This Court reviews evidentiary rulings for abuse of discretion. *White*, 492 F.3d at 398. Under the Federal Rules of Evidence, "irrelevant evidence is not admissible" at trial. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "This Circuit applies an 'extremely liberal' standard for relevancy." *Collins*, 799 F.3d at 578 (quoting *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006)).

The indictment alleged, among other things, that Defendant Ramer committed mail fraud in violation of 18 U.S.C. § 1341 and conspired to commit money laundering in violation of 18 U.S.C. § 1956(h). The elements of a violation of 18 U.S.C. § 1341 are: "(1) a scheme or artifice to defraud; (2) use of mails in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Warshak*, 631 F.3d 266, 310 (6th Cir. 2010). Meanwhile, to prove a violation of 18 U.S.C. § 1956(h), the government needed to show that: (1) two or more persons conspired to commit the crime of money laundering, and (2) the defendant knowingly and voluntarily joined the conspiracy. *United States v. Prince*, 618 F.3d 551, 553–54 (6th Cir. 2010).

We find that the evidence of Phase I was relevant to the government's efforts to prove Defendant Ramer's violations of 18 U.S.C. § 1341 during Phase I. The government attempted to link Defendant Ramer to Phase I with evidence that he worked with two of the Phase I companies. The government offered testimony from one witness who said that, beginning in April 2013, one of Ramer's associates solicited him for an investment in the Phase I company Clementsville Oil and Gas. The government also offered testimony from an investor who said that Defendant Ramer personally cold-called him in August 2013, asking him to invest $4,700 in the Phase I company Three Star Leasing. The jury apparently concluded that this evidence was insufficient to prove that Defendant Ramer was involved with Phase I beyond a reasonable doubt. However, the Phase I evidence is not retroactively irrelevant merely because the jury found it insufficient to support a guilty verdict.

The Phase I evidence was also relevant to establishing the existence of a money laundering conspiracy in violation of 18 U.S.C. § 1956(h).  As Defendant Ramer admits, the Phase I testimony included "significant exhibits . . . regarding how investor money moved" and testimony from an accountant hired during Phase I to "receive[] and forward[] company documentation and investor checks."  (Def. R. Br. 41.)  Even if Defendant Ramer was not a member of the money laundering conspiracy during Phase I, the government's burden was to show that he knowingly and voluntarily *joined* a conspiracy.  *See Prince*, 618 F.3d at 553–54.  Evidence that a conspiracy existed for Defendant Ramer to join was therefore "of consequence" to proving that he did, in fact, join the conspiracy.  Ramer's challenges to the Phase I evidence have no merit.

## VII.  SUFFICIENCY OF THE EVIDENCE

Defendant Westine challenges the sufficiency of the evidence to support his conviction for securities fraud (Counts 31–34) and for certain counts of mail fraud (Counts 2–5, 12, 15, and 16), raising several specific arguments.  The government argues that Defendant Westine waived these arguments below when he moved for judgment of acquittal under Rule 29.  A Rule 29 motion typically need not include any specific grounds in order to preserve all sufficiency of the evidence arguments for appeal.  *United States v. Dandy*, 998 F.2d 1344, 1356–57 (6th Cir. 1993).  But when a Rule 29 motion *does* raise specific grounds for acquittal, "all grounds not specified are waived."  *Id.*

Defendant Westine moved for judgment of acquittal pursuant to Rule 29 at the close of the government's case-in-chief, and he renewed his motion at the close of evidence.  Westine's motion raised a general challenge to the sufficiency of the evidence.  Significantly, however, his motion also challenged venue.

The law of this Court is ambiguous as to whether a challenge to venue qualifies as a specific challenge to the evidence such that all specific evidentiary arguments not raised are waived.  This Court examined a related issue in *United States v. Zidell*, 323 F.3d 412, 421 (6th Cir. 2003).  In that case, the question was whether a criminal defendant who sought to raise a venue challenge on appeal had preserved the issue at trial by challenging the general sufficiency

of the evidence in his Rule 29 motion.  *Id.* at 421.  We noted that "venue is not properly considered a true 'element' of a criminal offense," before reluctantly concluding that the defendant's venue challenge nevertheless had been preserved.  *Id.*

*Zidell* could be read as a warning that criminal defendants who wish to preserve the issue of venue *and* make a general challenge to the sufficiency of the evidence must raise venue at trial alongside an otherwise general Rule 29 motion, as Defendant Westine did below.  We find that this outcome would be incorrect, however, and inconsistent with *Zidell*.  We therefore hold that a general challenge to the government's proofs in a Rule 29 motion for judgment of acquittal suffices to preserve the issue of venue.  Conversely, a Rule 29 motion for judgment of acquittal that specifically raises the issue of venue will *not* be construed as a general challenge to the government's proofs; such a motion will waive all other grounds not specified in the motion. *See Dandy*, 998 F.2d at 1356–57 (6th Cir. 1993).  Given the potential ambiguity in Defendant Westine's circumstances, we do not apply today's holding retroactively, and we proceed to the merits of Westine's arguments.

This Court has explained that "[w]e review *de novo* the trial court's denial of a motion for judgment of acquittal." *Zidell*, 323 F.3d at 420.  Further, "[w]e review sufficiency of the evidence claims to determine whether any rational trier of fact could find the elements of the crime beyond a reasonable doubt and, in doing so, we view[] the evidence in the light most favorable to the prosecution, giving the government the benefit of all inferences that could reasonably be drawn from the testimony." *White*, 492 F.3d at 393 (alteration in original) (internal punctuation marks omitted).  "A defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986) (quoting *United States v. Soto*, 716 F.2d 989, 991 (2d Cir. 1983)) (internal quotation marks omitted).

### A.  Securities Fraud (Counts 31–34)

Defendant Westine argues that he cannot be convicted for securities fraud pursuant to 15 U.S.C. § 78j(b) because the investments he sold do not qualify as "securities."  Contracts that clearly fall within one of the statutory definitions of a security "are securities as a matter of law." *Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 546 (6th Cir. 2012).  The statute applicable in

this case defines the term security as including, among other things, "any . . . certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease." 15 U.S.C. § 78c(a)(10).

Defendant Westine argues that the contracts at issue do not fall within the definition of a "security" because they are "net royalty lease[s]." (Def. W. Br. 33.) He attempts to support this argument by reference to the Supreme Court's analysis in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). But the test from *Howey* applies only to contracts that do not clearly qualify as securities by statute. *See Nolfi*, 675 F.3d at 546. In this case, the "net royalty lease[s]" clearly qualify as securities under the Act because they are "certificates of interest or participation" in "any oil . . . royalty or lease." *See* 15 U.S.C. § 78c(a)(10). Thus, the *Howey* test is inapplicable, and Defendant Westine's argument fails. *See id.*

Defendant Westine also seems to argue that the contracts do not qualify as securities because the contracts themselves state that they are exempt from the Securities Act of 1933 as "working interest[s]" (rather than royalty interests) in the oil venture. (Def. W. Br. 33–34.) We decline to reach this issue, however, because Defendant Westine has not explained why a "net royalty lease" should be construed as creating a working interest as opposed to a royalty interest. *See United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). And in any case, Defendant Westine's argument is inconsequential because working interests fall within the statutory category of "*any interest* or participation in any profit-sharing agreement" in any "royalty *or lease*." 15 U.S.C. § 78c(a)(10) (emphases added); *see Nolfi*, 675 F.3d at 546 (treating contracts "analogous to . . . working interest[s] in oil" as "securities as a matter of law").

### B.  Mail Fraud (Counts 2–5, 12, 15, and 16)

Defendant Westine challenges certain counts of his mail fraud conviction on the basis that the mailings associated with the charges were not themselves unlawful. Mail fraud "consists of (1) a scheme or artifice to defraud; (2) use of mails in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *Warshak*, 631 F.3d at 310. A "defendant may commit mail fraud even if he personally has not used the mails." *United States v. Frost*,

125 F.3d 346, 354 (6th Cir. 1997).  "A mail fraud conviction requires only a showing that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen use of the mails."  *Id.*  Moreover, "[i]t is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot."  *Warshak*, 631 F.3d at 311 (quoting *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989)).

Defendant Westine argues that the mailings giving rise to Counts 2–5, 12, 15, and 16 were "legitimate business acts, taken not on behalf of Westine, but of Cornell and JMACK." (Def. W. Br. 35–36.)  For example, he explains, "Count 2 relates to a letter written from the Commonwealth of Kentucky to JMACK Energy regarding fixing certain well problems." (*Id.* at 35.)  The other challenged counts similarly involve JMack Energy's correspondence with the government regarding its legitimate oil operations.

This argument is unavailing.  A mailing need not be unlawful when viewed in isolation in order to be made "in furtherance of the scheme;" to the contrary, mailings that advance fraudulent schemes will often appear to be quite legitimate.  *See, e.g.*, *Warshak*, 631 F.3d at 311 (holding that shipments of herbal supplements that were ordered by customers were nevertheless made in furtherance of fraud because defendants generated the orders by deception).  And even if Defendant Westine himself did not conduct the mailings at issue, a jury could reasonably conclude that JMack Energy's governmental correspondence would "follow in the ordinary course of business" from the scheme in which he partook.  *Frost*, 125 F.3d at 354.  Indeed, a jury would need to look no further than Defendant Westine's repeated efforts to reassure investors by reference to JMack Energy's legitimate operations—efforts that culminated in a trip to observe JMack Energy's production facility.  Defendant Westine's sufficiency of the evidence challenges are without merit.

## VIII.  SENTENCING CALCULATIONS

Defendants challenge their sentences on numerous grounds.  This Court reviews the sentencing court's factual findings for clear error.  *United States v. Kennedy*, 714 F.3d 951, 957 (6th Cir. 2013); *United States v. Hamilton*, 263 F.3d 645, 651 (6th Cir. 2001).  But "whether those facts as determined by the district court warrant the application of a particular guideline

provision is purely a legal question and is reviewed *de novo* by this court." *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006) (internal quotation marks omitted). With regard to arguments not raised at sentencing, however, this Court reviews the application of a particular provision for plain error as long as the district court concluded the sentencing proceedings, as it did in this case for both Defendants, by asking the *Bostic* question. *See United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008).

### A.  Violation of Prior Judicial Order

Both Defendants challenge the district court's decision to apply a two-level sentencing enhancement under USSG §2B1.1(b)(9)(C), which provides for such an enhancement when the offense involved a "violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines."

The district court's factual findings on this matter are not clearly erroneous. The court found that "the offense involved the violation of a prior temporary restraining order ["TRO"] issued against Three Star Leasing." (R. 538 at PageID #7894.) The prosecution introduced the TRO at trial as Exhibit 57. The TRO prohibited "any person acting in active concert or participation with . . . these companies [Clementsville Oil and Gas Leasing, Liberty Oil Leasing, and Three Star Leasing]" from "making offers to sell and selling" various oil and gas interests. (GEX 57 at 2.) As to Defendant Westine, the district court found that the TRO prohibited him from "advertising on the Internet" and "raising money in connection with the scheme." (R. 538 at PageID #7897–98.) The district court also found that Defendant Westine ignored the TRO. These findings are consistent with the record.

Defendant Westine argues that the TRO does not qualify as a "prior" judicial order under §2B1.1(b)(9)(C). His logic is that the TRO is not "prior" because it was issued in connection with the charged conduct and did not precede it. We disagree. The commentary to §2B1.1(b)(9)(C) explains that a defendant "deserves additional punishment" if he "does not comply" with a judicial order because such noncompliance demonstrates his "aggravated criminal intent." USSG §2B1.1, comment (n.8(C)). The district court's application of this enhancement was based on precisely the type of "aggravated criminal intent" described in the

commentary:  Defendant Westine continued to operate a fraudulent scheme despite an injunction ordering its immediate termination.  Accordingly, we affirm the district court's interpretation that the TRO qualifies as a prior order for purposes of §2B1.1(b)(9)(C).

Defendant Westine also complains that the district court did not "set forth what language from the order itself that Westine violated." (Def. W. Br. 38.)  But the district court accurately described the dictates of the TRO, which was issued in 2013, and the court referred to testimony from a DFI witness who described how Defendant Westine ignored the order:

> Q. Did you continue to get phone calls?
>
> A. I did continue to get phone calls for quite a while, up until about the time of the final order.
>
> Q. And were these phone calls complaints, or what were they?
>
> A. They were complaints or inquiries, just checking to see if there was any registration, people who had already invested in Liberty or Clementsville being solicited to reinvest in Royal.
>
> Q. Okay. Did any of these complaints mention any of your restraining orders?
>
> A. Yes. We did have people who called who indicated that they had invested previously, and they were aware of the restraining order. They were given different explanations.
>
> Q. What do you mean by that, "different explanations?"
>
> A. Some people were told on the first order that [someone] named Don Howard that Don Howard was a problem and the company itself had gotten a restraining order against Don Howard, that there was nothing for them to worry about. Some of the people –
>
> Q. Was that true?
>
> A. And that was not true.

(R. 359 at PageID #4167–68.)  Based on this evidence, we find nothing erroneous about the district court's finding that Defendant Westine ignored the TRO, and we therefore affirm the application of the two-level enhancement to Defendant Westine's sentence pursuant to §2B1.1(b)(9)(C).

Meanwhile, Defendant Ramer complains that the TRO did not apply to him because the TRO applied only to Phase I companies and there is "simply no proof that Ramer had any involvement with any person or entity associated with Phase I . . . . Ramer was not a named party

in [the TRO]." (Def. R. Br. 47.)  Ramer is incorrect.  The TRO applied to "any person" with notice of the TRO who was involved with the Phase I companies.  GEX 57.  The record shows that Ramer was indeed involved with several of the Phase I companies while they were being spun off into the Phase II companies, and the record also shows that Ramer actively participated in this conversion—a process that was driven largely by the TRO.  For instance, one investor testified that Defendant Ramer reassured him that his $19,000 investment in a Phase I company would be "credited into" one of the Phase II spinoffs, Royal Leasing.  (R. 474 at PageID #6065–70.)  Thus, the district court did not clearly err when it found that Defendant Ramer, like Defendant Westine, violated the TRO.  We affirm the enhancements made pursuant to §2B1.1(b)(9)(C).

## B. Relocation of the Offense

Defendant Westine challenges the district court's decision to apply a two-level enhancement pursuant to USSG §2B1.1(b)(10)(A), which permits a sentencing court to impose such an enhancement if the defendant "relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials."  The district court applied this enhancement to Defendant Westine's sentence because:

> Mr. Westine used unsuspecting accounting firms and virtual office businesses to handle various aspects of the fraudulent enterprise.  And when these businesses began to suspect that these defendants were engaged in criminal activity and refused to continue to facilitate the scheme, then Mr. Westine and the co-defendants moved the location of their businesses and changed service providers.

(R. 538 at PageID #7901.)  These findings are supported by the record, which amply demonstrates that Defendant Westine used fictitious entities for the general purpose of evading detection and that it was criminal suspicion from contractors that repeatedly triggered his relocation.  We find no error in the application of §2B1.1(b)(10)(A) to Defendant Westine's sentence.

**C. Sophisticated Means**

Defendant Ramer challenges the district court's decision to apply a two-level enhancement pursuant to USSG §2B1.1(b)(10)(C), which permits a sentencing court to impose such an enhancement if the offense involved sophisticated means. The Guidelines explain that

> "[S]ophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

§2B1.1 comment (9(B)). We find Defendant Ramer's conduct analogous to the example listed in the commentary; the scheme involved purported oil well operations in Kentucky; soliciting operations in another jurisdiction (California); a wide assortment of fictitious entities, accounting firms, offices, and aliases; and the hiding of both assets and transactions. The district court reasonably concluded that "[i]f this case doesn't qualify for the two-level enhancement based on the sophistication of the fraud, then I am not sure that any case would qualify." (R. 451 at PageID #5612.) Defendant Ramer's arguments that the scheme was "no more sophisticated than other mail fraud schemes" and that his conduct merely involved "contact[ing] customers and s[elling] the programs based upon information that was provided by others" are unpersuasive. The district court properly enhanced Defendant Ramer's sentence pursuant to §2B1.1(b)(10)(C).

**D. Evidentiary Hearing**

Defendant Westine argues that "this case must be remanded for resentencing" because "the district court did not hold an evidentiary hearing on contested Guidelines issues and objections to the PSR." (Def. W. Br. 42.) In support, he cites USSG §6A1.3(b) for the proposition that "[t]he court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P." Defendant Westine also cites the commentary to that Guideline, which provides that "an evidentiary hearing may sometimes be the only reliable way to resolve disputed matters." *Id.* Despite these statements of law and allusions to the trial proceedings, Defendant Westine fails to specify which matters he considers disputed or how the

district court abused its discretion by denying his request for an evidentiary hearing. Accordingly, we deem this matter waived.  *See Elder*, 90 F.3d at 1118.

## E.  Loss Calculation

Defendant Ramer challenges the district court's decision to apply an eighteen-level enhancement pursuant to USSG §2B1.1(b)(1) for an amount of loss between $2.5 million and $7 million.   This Court has previously explained the standard of review and relevant legal principles for such appeals:

> We review the district court's calculation of the "amount of loss" for clear error, but consider the methodology behind it de novo.  *United States v. Poulsen*, 655 F.3d 492, 512–13 (6th Cir.2011).  The prosecution has the burden to prove by a preponderance of the evidence that the enhancement applies.  *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir.2003).
>
> The relevant amount of loss for a Section 2B1.1 enhancement is the greater of the actual loss, defined as the reasonably foreseeable pecuniary harm that resulted from the offense, or the intended loss to the victim.   SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. 3(A).  The district court's duty is to make a reasonable estimate of the loss.   SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. 3(C).

*United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013).

Defendant Ramer argued below, as he does here, that the foreseeable losses attributable to his participation in the fraud are limited to those involved with his personal company, R&W Marketing.  Alternatively, he argues that he is responsible only for losses from Phases II and III of the scheme.   But the government persuasively rebutted these arguments at sentencing, pointing out that Defendant Ramer was in a position to foresee all of the investments once he joined the scheme, not just those that flowed through R&W Marketing.  The government also zeroed in on the time frame in which the jury concluded that Defendant Ramer participated in the scheme beyond a reasonable doubt, calculating the amount of loss from that period:

[F]or every mail fraud count in the indictment where the mailing was after August of 2013, they [the jury] convicted Mr. Ramer.  A number of those counts involved mailings in that first phase.  We have lifted out of Exhibit 293, which was a list of all contributors during the entire scheme, those that invested after August of 2013, and the total amount of investment after August of 2013 was $2,617,534.

(R. 451 at PageID #5601.)

The district court agreed with the methodology, time frame, and loss calculation offered by the government, explaining:

The testimony and the documentary evidence at trial establish that Mr. Ramer had a different role later in the later phases but certainly was involved in all three phases with a -- as a salesperson early on, finally in more of a managerial status as it relates to some parts of the scheme as it unfolded; and so I will overrule the objection to the -- based on the loss amount raised by the defendant.

(*Id.* at PageID #5603.)

We find no error in the district court's reasoning or in the methodology it employed. Defendant Ramer has not shown that his participation or knowledge of the operation was limited to Phases II and III.  Rather, the evidence shows that Defendant Ramer joined the operation no later than August 2013, before the conclusion of Phase I.  The district court's loss calculation excluded all losses incurred prior to this date.  Thus, the district court properly applied an eighteen-level enhancement pursuant to USSG §2B1.1(b)(1) for an amount of loss between $2.5 million and $7 million.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Defendants' convictions and sentences.