UNITED STATES of America,
Plaintiff–Appellee,

v.

Stanford C. STODDARD,
Defendant–Appellant.

No. 88–1063.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 8, 1988.

Decided May 26, 1989.

James C. Mitchell, (argued) Asst. U.S. Atty., Office of the U.S. Atty., Detroit, Mich., for U.S.

E. Barrett Prettyman, Jr. (argued), Hogan & Hartson, Washington, D.C., for Stanford C. Stoddard.

Before WELLFORD and BOGGS, Circuit Judges; and SIMPSON *, District Judge.

WELLFORD, Circuit Judge.

This case presents a difficult and troublesome set of facts concerning a conviction under 18 U.S.C. § 656 for misapplication of bank funds. Stanford C. Stoddard was president of the bank holding company that owned Michigan Bank–Midwest (Midwest). The government alleged that Stoddard selected property that the bank would lease, purchased the property indirectly, and leased it to the bank for excessive rents. About two months after the jury verdict, it was revealed that Michigan Bank–Midwest was not a member of the Federal Reserve System as alleged in the indictment and proven at trial. Stoddard claims that this post-trial revelation destroys the court's jurisdiction and requires that the conviction be reversed. He also claims that the evidence was insufficient to sustain a verdict or that the weight of the evidence was against the verdict requiring a new trial. The district court rejected all three arguments. We reverse.

## I. FACTUAL BACKGROUND

Stanford C. Stoddard was convicted of misapplying bank funds in violation of 18 U.S.C. § 656 on August 10, 1987,[1] and was

---

* The Honorable Charles R. Simpson, III, United States District Court for the Western District of Kentucky, sitting by designation.

1. 18 U.S.C. § 656 states in its entirety:

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, *member bank,* national bank or *insured bank,* or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any

sentenced to three years in prison and a $5,000 fine. During all relevant time periods, Stoddard was chairman of the board and president of Michigan National Corporation (MNC), a bank holding company, which had purchased Midwest in 1981. The government's theory was that Stoddard arranged for a partnership in which he was interested to acquire property that Midwest needed and, in turn, leased the property to the bank at an exorbitant and unreasonable rate.

After several superseding indictments had been filed, the specified charge averred:

> Stanford C. Stoddard, ..., with intent to injure and defraud the Michigan Bank–Midwest, a *member of the Federal Reserve System*, did willfully and knowingly misapply and caused to be misapplied, and aided, and abetted in the misapplication of money and funds of said bank by arranging for the purchase of a property known as 105–109 East Michigan Avenue, Jackson, Michigan, for $41,500 and the lease of said property to the Michigan Bank–Midwest for ten years at an annual rate of $27,000, which was substantially in excess of the amount which would have been negotiated by unrelated, willing parties under the existing circumstances, and that Stanford C. Stoddard, ..., was, at the time, an officer of the Michigan National Corporation and was connected to Michigan Bank Midwest by virtue of its being a subsidiary of Michigan National Corporation, in violation of §§ 656 and 2, Title 18, United States Code (emphasis added).

At trial, the government offered evidence of the circumstances surrounding the transactions. On November 24, 1981, Stoddard had attended a board of directors meeting of the recently acquired Midwest bank in Jackson, Michigan. During that meeting, there were discussions regarding the unavailability of a permanent location for a temporary branch office operating in the downtown Jackson area. After the board meeting, Stoddard, accompanied by Howard Cochran, then a senior vice president of MNC and a director of Midwest, found a vacant building at 105 East Michigan Avenue in downtown Jackson. That same day, after inspecting the interior of the property with Stoddard, Cochran made a "fully assignable" purchase offer agreement, offering $38,500 for the property. It was Cochran's sole intent in making the offer to assist in acquiring a branch site for Midwest. Stoddard and Cochran returned to the property with Ruben Bergman, then president of Midwest, and advised him that this would be the new location of the permanent downtown branch.

While driving back to Detroit later that day, Stoddard advised Cochran that, with respect to the purchase of the 105 East Michigan Avenue property, Stoddard would have "Mr. Terova handle it," and also, that he would "give Mr. Zweig a call."

That evening Stoddard called Curt Terova, a consultant to MNC and in 1983 a vice president of MNC, and told Terova about the downtown Jackson property. Stoddard said that it would cost about $35,000 and was suitable for a branch bank location. Stoddard then noted that "[it] would be a good property for Amberly Properties to

---

moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

As used in this section, the term "national bank" is synonymous with "national banking association"; "member bank" means and includes any national bank, state bank, or bank and trust company; *which has become a*

*member of one of the Federal Reserve banks;* and "insured bank" includes any bank, banking association, trust company, savings bank, or other banking institution, the *deposits of which are insured* by the Federal Deposit Insurance Corporation.

(Emphasis added). "A bank officer misapplies funds [of a federally insured or Federal Reserve member bank] when, *inter alia,* he converts funds to his own use or that of a third party, lends money to a fictitious borrower, causes a loan to be made to his own benefit while concealing his interest from the bank, or violates state law or bank policy." *United States v. Bruun,* 809 F.2d 397, 408 (7th Cir.1987).

own." Amberly Properties was a partnership comprised of Stoddard and Terova that leased several buildings to MNC banks. Stoddard claims that these affiliations were completely disclosed and a matter of public record.[2]

Terova told Stoddard "we can't own it because we are officers of the corporation," and "we can't buy it." Stoddard responded, "Well, I'll have Ray [Zweig] buy it.... We'll let Ray own it for a year or so, and then we'll buy it back." At Stoddard's request, Stoddard's attorney, Zweig, purchased the property for $41,500 and leased the property to Midwest for ten years at $27,000 per year. Ruben Bergman signed the lease on behalf of Midwest indicating that the specifics of the lease were negotiated by MNC, not by himself, and that in his opinion the lease offered by Zweig was not subject to negotiation. Bergman also complained to Stoddard through Cochran that the lease payments were too high by about one-half. Cochran related Bergman's complaints to Stoddard personally.

In January of 1983, Stoddard told Terova that it was time to buy the Jackson property back from Zweig and to have Zweig write the letter offering to sell the property to Amberly Properties. Shortly thereafter, Zweig sold the Jackson property to Amberly Properties for $41,500, and also assigned the $27,000 per year lease to Amberly. He notified Midwest to begin sending the payments directly to Amberly.

In November, 1984, Midwest sent a letter to Amberly indicating its dissatisfaction with the lease terms and its intention to withhold future payments. Significantly, Stoddard and Terova then deeded the Jackson property to Midwest at no cost and agreed to pay $25,000 cash to settle the potential civil claim by the bank over the lease.

Proof that the terms of the lease were excessive was critical to the government's case. At trial, Bergman testified that he thought the lease terms were high. Ho-

ward Ginther, a real estate broker in Jackson, Michigan, who showed the property to Stoddard and sold it to Zweig, testified that the $27,000 a year rental rate for the Jackson property was higher than neighboring properties. He testified that normally such properties would be leased for $2 to $3 per square foot. Ginther, however, could not name a specific building that was rented at that rate. He also noted that the CityBank building, which was across the street from the Jackson property, was renting for $5 to $6 a square foot.

William McConkey, a real estate broker and vice president of the Jackson Board of Realtors, testified that the lease in question was very favorable to the landlord. The triple net lease is a lease in which the tenant is responsible for taxes, insurance, utilities, and maintenance. He thought that a comparable building would lease for between $2.50 and $3 per square foot. He also testified that the rental market in downtown Jackson was very depressed.

The defendants offered the testimony of two appraisers. The first, Meagher, testified that the fair annual rental of the lease would be $24,750. He based his opinion on six buildings in the vicinity of the Jackson Bank building. Parkinson, the other appraiser, testified that the lease would be worth about $27,769.50 on an annual basis. The defendants also proved that a photography studio near the Michigan Avenue property paid $6.90 per square foot for its studio.

At trial, two witnesses testified that Midwest was a member of the Federal Reserve System. The witnesses also testified that the bank was insured by the Federal Deposit Insurance Corporation (FDIC). The certificate of FDIC status is in our record on appeal but it is not clear that it was produced at trial. The prosecutor stated in closing argument, and the defendant conceded, that Midwest was a member of the Federal Reserve System.

After the jury verdict and prior to sentencing—the defendant advised his attor-

---

2. These records were not part of the trial record but defendant asks that the court take judicial notice of them. Petitioner's Brief at 8 n. 14.

neys that he thought that Midwest was not a member of the Federal Reserve System. Stoddard then filed his "Motion to Dismiss and/or Motion for New Trial Based on Newly Discovered Evidence," which asserted that Midwest was not a part of the Federal Reserve. The motion was denied by the trial judge on December 2, 1987.

Stoddard raises two issues on appeal—jurisdiction and sufficiency of evidence. First, Stoddard claims that because in fact Midwest was not a member of the Federal Reserve System as alleged and "proven" at trial, the subject matter jurisdiction of this prosecution was lost because, by the terms of the indictment, federal jurisdiction was based solely on the fact that Midwest was a member of the Federal Reserve System. Second, Stoddard claims that the evidence submitted to the jury was insufficient to sustain the verdict of wilfull misapplication of bank funds. The district court rejected both arguments and this appeal ensued.

## II. JURISDICTION

■ The first question before this court is whether the discovery, after trial, that evidence of Midwest's membership in the Federal Reserve System was mistaken, deprived the court of jurisdiction. Insured status or reserve membership is an essential element of a § 656 violation and must be established by the government. *See United States v. Glidden*, 688 F.2d 58, 59 (8th Cir.1982) (making similar statement regarding federal prosecution under 18 U.S.C. § 2113(a) for bank robbery). In the indictment, federal jurisdiction was based upon Stoddard's employment as an officer of a member bank of the Federal Reserve System. The district court instructed the jury of this requirement. The statute in question to which the indictment referred, however, also permits the prosecution based on the bank's status as a federally insured bank. The latter FDIC basis was not included in the indictment, although testimony heard at trial established both bases. Two months after trial, Stoddard's

counsel suspected that Midwest was *not* in fact a member bank of the Federal Reserve System and confirmed his suspicion by telephoning the Federal Reserve Bank branch in Chicago. Defendant contends that this circumstance deprives the court of jurisdiction and voids his conviction. We disagree.

Federal courts are courts of limited jurisdiction, and the lower federal courts' jurisdiction "is further limited to those subjects encompassed within a statutory grant of jurisdiction." *Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 701, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). The district court's jurisdiction in these cases is conferred by 18 U.S.C. § 3231 which reads, "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." *See Camp v. United States*, 587 F.2d 397, 399 (8th Cir.1978) (stating, "[j]urisdiction is essentially the power or authority conferred upon a court to decide a given type of case").

The district court's jurisdiction in a criminal proceeding is generally established by the indictment. *See United States v. Thomas*, 610 F.2d 1166, 1172 (3d Cir.1979) (per curiam) (stating, "[o]nce the petit jury found that the bank was nationally chartered, the jurisdictional element was established"); *United States v. Buskey*, 38 F. 99, 100 (C.C.E.D.Va.1889) (stating "the trial of officers of national banks who are charged with abstracting, embezzling, or misapplying funds ... is within the exclusive jurisdiction of the courts of the United States"); *United States v. Rogers*, 23 F. 658, 663 (C.C.W.D.Ark.1885) (stating subject matter jurisdiction is established by the indictment).

Because the indictment clearly stated an offense under 18 U.S.C. § 656, the offense for which petitioner was convicted, "the district court unquestionably had jurisdiction over petitioner's offense" subject to an appropriate showing of proof.[3] *Camp*, 587

---

**3.** We are aware that in *United States v. Mize*, 756 F.2d 353, 355–56 (5th Cir.1985), the Fifth Circuit reversed a conviction under the same misappli-

cation statute where the indictment alleged membership in the Federal Reserve System and where the jury was so instructed, but the

F.2d at 399. The post-conviction assertion that Midwest was not a member of the Federal Reserve system does not defeat the assertion of the district court's jurisdiction under 18 U.S.C. § 656. An alternative basis for jurisdiction, FDIC insured status, may have been established, albeit by minimal proof. We stress, therefore, that this is not a case in which the defendant attacks a conviction because no possible basis supports the exercise of the convicting court's jurisdiction. *See, e.g., Wise v. Withers,* 7 U.S. [3 Cranch] 331, 2 L.Ed. 457 (1806) (person not in military could challenge jurisdiction of court martial court collaterally). Here there was a jurisdictional predicate set out in the indictment, and based on the proof, for a trial on the criminal charges involving conspiracy and misapplication of bank funds in violation of 18 U.S.C. § 656.

In sum, we find that the district court had jurisdiction in this case based upon the indictment charges and based upon the proof submitted—that the proof relating to Federal Reserve membership was mistaken did not constitute a jurisdictional deficiency.

### III. RULE 33 ANALYSIS

 Although we find that the post-conviction revelation does not divest the court of jurisdiction, it does reveal a defect in the substantive presentation of the government's case. In its brief, the government concedes that "the statute's requirement of federally protected status for a bank serves a dual purpose, constituting both a jurisdictional predicate and an essential substantive element of the criminal offense." Brief of Appellee at 10. The government conceded as well, following the denial of the new trial motion, that Midwest was not a member of the Federal Reserve System—in effect, that the testimony relating to one of the offense's substantive elements was objectively false.

The district court turned to Federal Rule of Criminal Procedure 33 for guidance when defendant brought the membership information to its attention. Rule 33 appears to be the only provision to which the court could turn at that stage of the proceedings. Rule 33 allows the district court to grant a new trial under certain circumstances including newly discovered evidence. Because this motion was made well after seven days following the guilty verdict, newly discovered evidence is the only basis upon which the court has to grant a new trial.

Under Rule 33 the new evidence normally must satisfy four requirements before the district court will grant a new trial: "The evidence: (1) must have been discovered after trial, (2) must not have been discoverable earlier in the exercise of due diligence, (3) must be material and not merely cumulative or impeaching, and (4) must be likely to produce an acquittal if the case were retried." *United States v. Christian,* 786 F.2d 203, 210 (6th Cir.1986) (quoting *United States v. Scaife,* 749 F.2d 338, 349 (6th Cir.1984)). "An exception exists, however, where it is shown that the Government's case included false testimony and the prosecution knew or should have known of the falsehood. . . . [A] new trial must be held if there was any reasonable likelihood that the false testimony would have affected the judgment of the jury." *United States v. Antone,* 603 F.2d 566, 569 (5th Cir.1979). *See also United States v. Turner,* 490 F.Supp. 583, 598 (E.D.Mich.1979), *aff'd,* 633 F.2d 219 (6th Cir.1980) (noting that in cases of governmental misconduct strict adherence to traditional four requirements is not necessary).

---

government failed to introduce any evidence of Federal Reserve membership. Because *no evidence* was admitted regarding an essential element of the offense (even though evidence was admitted alleging FDIC status, an alternative jurisdictional basis), the conviction was reversed. We view *Mize* as a straightforward sufficiency of the evidence case rather than as a case about jurisdiction. *Mize* is not applicable

in this regard because Stoddard was convicted in a jury trial in which the proof and jury instruction conformed to the allegations in the indictment. *See United States v. Cusmano,* 659 F.2d 714, 719 (6th Cir.1981) (stating that a conviction can be sustained only when proof and instruction conform to the terms of the indictment).

The district court applied the general criteria and denied defendant's new trial motion because the evidence was discoverable by the defendant with due diligence and that it was not likely to produce an acquittal if the case were retried. We believe, however, that this is one of the rare cases in which the exception is applicable rather than the rule.

The government knew or should have known that Midwest was not a member of the Federal Reserve System. It is their gross lack of diligence rather than the defendant's that is in issue here. Numerous courts have noted that despite the importance of establishing reserve membership or insured status, "prosecutors have been extremely lax in the treatment accorded this element." *United States v. Platenburg*, 657 F.2d 797, 799 (5th Cir.1981). *See, e.g., United States v. Sliker*, 751 F.2d 477, 483–85 (2d Cir.1984), *cert. denied sub nom. United States v. Buchwald*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985); *United States v. Knop*, 701 F.2d 670, 674 (7th Cir.1983); *id.* at 676–77 (Posner, J., dissenting); *United States v. Maner*, 611 F.2d 107, 111–12 (5th Cir.1980). Because the government should have known the evidence was false, a new trial must be granted if the new evidence is likely to produce an acquittal upon retrial.

We also disagree with the district court's conclusion that this evidence is not likely to produce an acquittal at retrial. The evidence definitively prevents the government from establishing an element of the offense outlined in the indictment. Although we do not expect the government to retry defendant without altering the terms of the indictment, if they did, surely he would be acquitted.

The government contends that the conviction may stand because the reference to the statute informs defendant that FDIC status can be substituted for reserve membership to establish this element of the offense. *United States v. Coleman*, 656 F.2d 509 (9th Cir.1981), upon which the government relies for support, is readily distinguishable. The indictment in *Coleman* charged a statutory violation *without* *specifying* whether the savings and loan association in question was "federally chartered" or "federally insured." Here, in contrast, the government charged *only* that the bank was a Federal Reserve System member bank and notified him *only* of that alleged status which would serve as a substantive element of the offense.

Holding otherwise would permit the jury to convict a defendant of an offense for which he was not indicted and on which the jury was not instructed. For example, in *United States v. Mize*, 756 F.2d 353 (5th Cir.1985), the indictment specifically asserted that the bank was a "member bank of the Federal Reserve System." *Id.* at 355. Instead of proving this assertion, the government in *Mize* "established that the Bank was insured by the Federal Deposit Insurance Corporation (FDIC)." *Id.* at 355. The district court instructed the jury that it could convict if, among other things, the government established that "the Bank was ... a § 656 'national bank or an insured bank.'" *Id.* at 355. Despite the fact that defendant made no objection to these instructions, the *Mize* court found that there had been a "constructive amendment of the indictment at trial," *id.* at 356, 357, and thus reversed the conviction. *See United States v. Ford*, 872 F.2d 1231, 1234–37 (6th Cir.1989) (discussing amendments and variances in indictments); *see also United States v. Schmuck*, ___ U.S. ___, 109 S.Ct. 1443, 1451, 103 L.Ed.2d 734 (1989) (stating "[i]t is ancient doctrine of both the common law and of our Constitution that a defendant cannot be held to answer a charge not contained in the indictment brought against him.... This stricture is based at least in part on the right of the defendant to notice of the charge brought against him"). We join the lament of the *Mize* court: "We reach this result with great reluctance, for although Mize's guilt was established beyond a reasonable doubt, the inconvenience and expense of retrial are now necessary." *Mize*, 756 F.2d at 357.

We have previously emphasized the importance of presenting to the jury for its determination the indictment element of the "federal" status of the subject bank.

*See United States v. Mentz,* 840 F.2d 315 (6th Cir.1988). In *Mentz,* we cited case language from *Glenn v. Dollman,* 686 F.2d 418, 421 (6th Cir.1982):

> Where a jury sits as the finder of fact in a criminal trial, the court's instructions to the jury concerning the necessary elements of the crime charged are the only means of assuring that the State is put to its burden of establishing every element of the crime.

*Mentz,* 840 F.2d at 319. *Mentz* did note that in an appropriate situation "a court may take judicial notice of adjudicative facts in a criminal case," *id.* at 322, but it must be careful to make a proper record and show the justification for doing so. Regrettably, we find no record in the instant case which avoids the necessity of reversal where it is clear that, in fact, Midwest was not a Federal Reserve System member.

The evidence presented post-trial may not have been discovered diligently by defendant, but, in light of the plethora of warnings given to the government, they should have discovered it. The new evidence clearly reflects that Midwest is not what it was alleged to be in the indictment in order to set out a "federal" basis for the prosecution. The evidence was material and likely would have produced an acquittal on that issue if made known at trial. We must therefore, for the reasons stated, set aside the conviction and order a new trial.[4]

We make it clear that we find no insufficiency in the evidence on the merits of the § 656 charge of misapplication of bank funds.

We REVERSE and REMAND accordingly.

---

**4.** Retrial of Stoddard is not prohibited by the double jeopardy clause of the fifth amendment because a reversal is not predicated on the sufficiency of the evidence. *Burks v. United States,* 437 U.S. 1, 15–17, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1 (1978).