NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0359n.06

Nos. 19-5088/5374

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 18, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| BRIAN BLACK, | ) | |
|     Defendant-Appellant. | ) | |
| | ) | |

BEFORE: MERRITT, MOORE, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Brian Black served as the trustee for the Oleen Fewell Estate Trust, a trust that Oleen Fewell created to ensure that her daughter would have enough money after Fewell died. In 2012 the Trust's bank account totaled $204,894.49. Two years later it totaled $6.99. Where did the money go? The government alleged that Black used the Trust's money to cover his personal expenses, including expenses for his go-karting and hunting hobbies. A jury convicted Black of mail and wire fraud. After imposing a 57-month sentence, the district court ordered him to repay $150,422.53 in restitution. Black now challenges the sufficiency of the evidence for his fraud convictions, and argues that the district court erred in choosing the restitution amount. Finding no error, we affirm.

I

Given the jury verdict against Black, we recount the facts in the light most favorable to the government. *See, e.g.*, *United States v. Brown*, 732 F.3d 569, 576 (6th Cir. 2013).

Oleen Fewell died in 1996. Fewell's will created a trust for the benefit of her middle-aged daughter, Sharon Conner. According to her brother, Sharon was "terrible with money." The Trust documents thus instructed the trustee to give Sharon a monthly stipend and to use its assets to maintain the Trust's property (including the farmhouse in which Sharon lived and some surrounding farmland in western Tennessee). Fewell initially named her nephew, Gerald Fewell Harber, to serve as trustee. He did so until his 2003 death. Before Fewell died, she had asked her great-nephew Lionel Hughes, a local insurance agent, to serve as a substitute trustee once Harber could no longer serve in that role. Hughes took over in 2003.

When Fewell died, her roughly $300,000 estate consisted mostly of the 88-acre farm. Thirteen years later, the Trust had run out of cash. Hughes began loaning money to the Trust to pay for Sharon's monthly expenses, which totaled about $1,500 a month. He believed that he had the discretionary power to sell the farmland and replenish the Trust's cash, but petitioned the probate court for advice. The court agreed. Hughes sold the farmland at a public auction for around $325,000. The buyers paid a $52,000 down payment to the Trust, and promised to pay the remainder with interest over ten years. Hughes repaid himself the money he had loaned the Trust and petitioned the probate court to withdraw as trustee, a role he found stressful.

In 2010 the probate court appointed Brian Black to replace Hughes as the trustee. Black was good friends with Sharon (and her husband Tommy and son Chris). The probate court required Black to post a $310,000 bond. Without this bond, Black could not serve as trustee or

access the Trust's money. Black purchased this bond from a Michigan insurance company through Hughes's local insurance agency and paid an annual premium to renew it each year.

When Black took over, the Trust was still largely illiquid. It held the farmhouse and a note receivable from the farmland sale, but had only about $17,000 in cash. Things changed two years later. In February 2012, the farmland's buyers paid the Trust the remaining $200,000 they owed in a lump sum. When that payment arrived, the Trust held $204,894.49 in its bank account. By July 2014, the account had dwindled to $6.99. This rapid spending caught the bank's attention. Bank officials noticed that Black had written many checks to himself rather than to merchants, leading them to suspect that he was mishandling the Trust's money. The bank reported Black to the authorities.

A postal inspector employed by the U.S. Postal Service and Jack Dietz, a contract postal inspector employed by a private company, began to investigate Black's conduct as trustee. After interviewing witnesses (including Sharon), reviewing bank records belonging to the Trust and to Black, and subpoenaing the records that Hughes and Black had kept in their successive tenures as trustee, the postal inspectors confirmed the bank officials' suspicions. The inspectors concluded that Black had embezzled $178,372.53 from the Trust.

Some of the Trust's money went to improve the finances of Black and his friends. Black, for example, spent $5,500 to pay off his personal debts: $2,800 to a maxed-out American Express card and $2,700 to Morgan & Pottinger, a debt-collection firm collecting an old debt. Black also used over $18,000 of the Trust's money to provide interest-free loans to his friends, only $10,500 of which was ever repaid. And Black frequently wrote checks from the Trust's account to himself and either cashed them or deposited them in his own checking account.

Some of the Trust's money went to improve Black's home. Black spent nearly $9,000 to purchase what the seller described as a "top of the line" storage building and some "very nice" backyard furniture. He spent over $1,000 for a Texas Elite meat smoker. And he spent nearly $11,000 on a tractor with a lawnmower attachment. (Black later sold this piece of equipment for $11,000 but deposited the proceeds in his own bank account rather than in the Trust's account.) Black also used the Trust's money to, among other things, install a new air conditioner at his home (nearly $3,000), fertilize his lawn ($350), and buy a high-end Rainbow vacuum ($2,000).

But most of the Trust's money went toward Black's hobbies. A St. Louis Cardinals fan, Black spent nearly $6,000 to attend a "fantasy camp" and receive instructions from former players. Black was also an avid hunter and member of a hunting club. He bought a range of hunting-related items. These included: (1) two shotguns and a rifle (around $900), (2) three all-terrain vehicles and an amphibious vehicle ($5,100, at least $2,500, $3,845, and $4,000) for the club's members to ride between hunting locations, and (3) a large trackhoe excavator ($17,000) to clear paths at the club.

After becoming trustee Black also developed an interest in go-kart racing. He used $13,500 from the Trust to purchase two go-karts, a trailer, and some parts and paraphernalia from a father-and-son pair in Illinois. To fund the hobby, the son had sold go-kart parts to other racers under the business name Bang Bang Kart Supply. Once Black purchased this "business," he opened and controlled a bank account using the Bang Bang Kart Supply name. And he began racing go-karts and operating a similar business selling go-kart parts under that name. From then until the Trust ran out of money, Black used its funds to subsidize his go-karting, ultimately transferring $74,528 from the Trust account to his Bang Bang Kart Supply account. Besides those transfers, Black also used the Trust's money to buy two more go-karts ($1,000) and another trailer ($5,600).

The government indicted Black on eleven counts of mail fraud, wire fraud, or transporting stolen money in excess of $5,000 in interstate commerce. 18 U.S.C. §§ 1341, 1343, 2314. While Sharon had died before trial, the government offered testimony from thirty other witnesses over six days. Jack Dietz, the contractor who investigated Black's time as trustee and evaluated the legitimacy of his spending, served as a key witness. Black testified in his own defense, asserting that his many expenditures on seemingly personal items were either made for Sharon's benefit, made as repayment for money he had given her, or made with her permission. A jury convicted Black of three counts of fraudulently transferring stolen money, one count of mail fraud, and two counts of wire fraud. It acquitted him of the other counts. The district court sentenced Black to 57 months in prison followed by three years of supervised release and ordered him to repay the Trust $150,422.53 as restitution.

II

Black raises two arguments on appeal. He says that the government presented insufficient evidence to support his one mail-fraud conviction and two wire-fraud convictions. And he says the district court wrongly relied on Dietz's testimony to set the amount of restitution.

A. Fraud Convictions

A defendant raising a challenge to the sufficiency of the evidence must meet a "demanding legal standard[.]" *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). The defendant must show that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation omitted). Black has not met this standard for his fraud convictions.

1. *Mail Fraud.* The mail-fraud statute consists of one very long sentence:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341. We have read this language to require, among other things, that a defendant devise a "scheme to defraud" and use "the mails in furtherance of that scheme." *United States v. Petlechkov*, 922 F.3d 762, 766 (6th Cir. 2019); *United States v. Warshak*, 631 F.3d 266, 310–11 (6th Cir. 2010); *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997).

Black challenges the sufficiency of the evidence only for the use-of-the-mails element, arguing that the government failed to prove that he used the mails to further the scheme to defraud the Trust. The Supreme Court has long read this element in a "fairly expansive" fashion. *Warshak*, 631 F.3d at 311; *see Schmuck v. United States*, 489 U.S. 705, 710–11 (1989); *Pereira v. United States*, 347 U.S. 1, 8–9 (1954). That is true both for the connection that a mailing must have to the *defendant* and for the connection that it must have to the *fraud*.

Start with the mailing's connection to the defendant. Because the statute reaches a defendant who knowingly "causes" mail to be delivered, 18 U.S.C. § 1341, the "defendant may commit mail fraud even if he personally has not used the mails," *Frost*, 125 F.3d at 354. The Supreme Court has instead held that if "one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not

actually intended, then he 'causes' the mails to be used." *Pereira*, 347 U.S. at 8–9; *see United States v. Ramer*, 883 F.3d 659, 683 (6th Cir. 2018).

Turn to the mailing's connection to the fraud. The statute indicates that a defendant must use the mails "for the purpose" of executing the fraud scheme. 18 U.S.C. § 1341. Yet the Supreme Court has held that the mailing itself need not be "an essential element" of that scheme; the mailing need only be "incident to an essential part" of it. *Pereira*, 347 U.S. at 8; *see Schmuck*, 489 U.S. at 710–11. And the mailing may qualify even if it is "innocent or even legally necessary," *Frost*, 125 F.3d at 354 (citation omitted), so long as it somehow aids the scheme, *Ramer*, 883 F.3d at 684; *United States v. Hartsel*, 199 F.3d 812, 818 (6th Cir. 1999).

A comparison of *Ramer* and *Hartsel* illustrates these rules in practice. In *Ramer*, the defendants "schemed to defraud investors through the marketing of a series of spurious oil and gas drilling projects." 883 F.3d at 667. To meet the use-of-the-mails element, the government relied on mailings about legitimate matters between a state government and a legitimate oil facility. *Id.* at 668, 684. One defendant argued that these mailings did not suffice. We disagreed: "A mailing need not be unlawful when viewed in isolation in order to be made 'in furtherance of the scheme;' to the contrary, mailings that advance fraudulent schemes will often appear to be quite legitimate." *Id.* at 684. And the legitimate oil facility helped the scheme because the defendants used it "to reassure investors by reference to [the facility's] legitimate operations[.]" *Id.* So a rational jury could find that the routine mailings also aided the scheme by bolstering the legitimate nature of those operations. *Id.*; *see United States v. Bankston*, 820 F.3d 215, 235–36 (6th Cir. 2016).

In *Hartsel*, by contrast, the government argued that the defendant fraudulently used a charity's money for personal ends. 199 F.3d at 814–15. To meet the use-of-the-mails element, the government relied on bank statements for the charity's bank account that the bank mailed to the

defendant. *Id.* We found that the bank account was an "essential part" of the scheme and that "the mailing of the bank statements was incident to the maintenance of that account." *Id.* at 818. But we overturned the conviction because we saw no evidence that the statements were "used in some way to aid or further the scheme." *Id.* No evidence suggested the defendant had ever used the statements for "a bookkeeping or accounting function" or that he needed them "to reconcile the account and ensure it maintained a positive balance during the period of the scheme." *Id.*

In this case, the government relied on mailings about Black's bond renewal to meet the use-of-the-mails element. Recall that the probate court required Black to post a $310,000 bond to serve as trustee. Black got this bond from a Michigan insurance company through Lionel Hughes, his predecessor trustee and a local insurance agent. Black paid an annual premium to Hughes to keep this bond, and Hughes passed the funds on to the insurance company. According to the indictment, the mail-fraud charge rested on a "premium notice and invoice" that Hughes sent Black in 2013 notifying him that the annual premium was due. The government presented this notice and invoice at trial, along with testimony from Hughes. In late February 2013, Hughes received the premium notice in the mail from the insurance company. The notice included the amount that Black owed to renew his bond for the period from May 2013 to May 2014. Hughes then created an invoice for that amount and mailed it to Black with the premium notice. Black wrote a check for the premium on April 1.

This evidence would allow a rational jury to find the use-of-the-mails element met because the mailing of the premium notice and invoice was sufficiently connected to Black and to his fraud. To begin with, the jury could have found that Black "caused" the bond mailings by enlisting the insurance company and Hughes to get the bond. 18 U.S.C. § 1341. One could reasonably conclude

that Black knew these mailings would "follow in the ordinary course of" that bond transaction. *Ramer*, 883 F.3d at 684 (quoting *Frost*, 125 F.3d at 354).

The jury next could have found that this mailing was sufficiently connected to Black's fraud scheme. One could reasonably view the bond as an "essential element" of that scheme. *Pereira*, 347 U.S. at 8. Hughes testified that Black "could not" "have served as trustee without this bond," which was designed to guarantee that Black would "faithfully perform his duties[.]" In other words, Black would not have had access to the Trust's money that he misused without the bond. Documents from the probate court and testimony from its clerk confirmed this fact. The mailing also could reasonably be viewed as "incident to" this essential bond element. *Id.* It furthered the fraud by notifying Black of the premium necessary to renew the bond and maintain access to the Trust's money. *See Hartsel*, 199 F.3d at 818.

Black's responses do not change this. He starts with a mistaken legal argument—that the sufficiency of the evidence concerning this element implicates the district court's subject-matter jurisdiction. It does not. A federal statute gives district courts "original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." 18 U.S.C. § 3231. The government properly invokes this jurisdiction when it files an indictment charging a defendant with a violation of a federal criminal law, even if it later turns out the government lacks sufficient evidence for a conviction. *Compare United States v. Stoddard*, 875 F.2d 1233, 1236–37 (6th Cir. 1989), *with id.* at 1238–39. And a claim that the government failed to prove an element of the crime—like the use-of-the mails element in Black's case—raises a merits challenge, not a jurisdictional one. *See United States v. Stone*, 762 F. App'x 315, 320–21 (6th Cir. 2019); *United States v. Bacon*, 884 F.3d 605, 608–09 (6th Cir. 2018).

9

Turning to the merits, Black argues that the government failed to prove that he mailed his premium payment to Hughes because he testified that he would usually deliver those payments by hand. True or not, this fact does not help him. The government charged Black in a *different* mail-fraud count with mailing the April 1 payment back to Hughes. But the jury acquitted him on that count. It convicted Black on the count involving Hughes's mailing of the notice and invoice. So the manner in which Black returned the premium payment to Hughes does not matter.

Black next argues that the mailing for his bond was "not fraudulent." Apt. Br. 15. That fact does not help him either. Even if a mailing is "innocent," *Frost*, 125 F.3d at 354 (citation omitted), it can support a mail-fraud conviction. The statute does not require the mailing to "be unlawful when viewed in isolation." *Ramer*, 883 F.3d at 684; *Schmuck*, 489 U.S. at 714–15.

Black lastly compares his case to *Hartsel*, suggesting that the premium notice and invoice were like the bank statements in that case. *See* 199 F.3d at 816–18. In neither case, Black says, did the mailing facilitate the fraud. Yet the problem in *Hartsel* was the lack of evidence that the defendant used the bank statements in any way to manage the bank account. *Id.* Here, however, the premium notice and invoice were effectively a bill, not just a summary of an account. A rational jury could conclude that the notice and invoice reminded Black that he must pay the premium, and so facilitated the fraud by helping him keep the bond that he needed to control the Trust's money. Confirming this point, Hughes noted that all of the bond-related documents that he testified about, including the premium notice and invoice, were necessary for processing and renewing the bond.

2. *Wire fraud*. The wire-fraud statute consists of a similar (and similarly long) sentence:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. Given the similar language in the mail-fraud and wire-fraud statutes, we have long recognized that wire fraud "has essentially the same elements" as mail fraud except that it requires the use of a wire rather than the use of the mails. *United States v. Olive*, 804 F.3d 747, 753 (6th Cir. 2015); *see United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013); *United States v. Bibby*, 752 F.2d 1116, 1125–26 (6th Cir. 1985).

As with his mail-fraud conviction, Black challenges the sufficiency of the evidence only for this use-of-a-wire element. Yet a rational jury could have found this element met for the same reasons it could have found the use-of-the-mails element met. According to the indictment, the transfers supporting Black's wire-fraud convictions were two transfers of funds (one in 2012 and one in 2013) from the bank account belonging to Hughes's insurance agency to the bank account belonging to the Michigan insurance company. Hughes testified that the transfers were payments for Black's bond. One could reasonably find that Black "cause[d]" these transfers by buying the bond and paying the premium. 18 U.S.C. § 1343; *Ramer*, 883 F.3d at 684. And one could reasonably find that they were "incident to an essential part" of Black's scheme because they paid for the bond that gave him access to the Trust's funds. *Pereira*, 347 U.S. at 8.

In response, Black again says that the wire transfers were "not fraudulent." But just as the use of the mails need not be fraudulent, *Frost*, 125 F.3d at 354, so too the use of the wires need not be. As noted, we have interpreted the two statutes in the same way. *See Olive*, 804 F.3d at 753. Black also re-raises his analogy to the bank statements in *Hartsel*. Unlike with the bank

11

statements in that case, however, a rational jury could conclude that the wire transfers aided the scheme. *Hartsel*, 199 F.3d at 818.

## B. Restitution Order

The Mandatory Victims Restitution Act requires a district court to order restitution when a defendant commits an offense "by fraud or deceit" that results in a "pecuniary loss" to "an identifiable victim." 18 U.S.C. § 3663A(c)(1). The government bears the burden of proving by a preponderance of the evidence the amount of a victim's loss, *id.* § 3664(e), and a district court must then impose "the full amount of each victim's losses as determined by the court," *id.* § 3664(f)(1)(A). We review the district court's ultimate restitution amount for an abuse of discretion. *United States v. Sawyer*, 825 F.3d 287, 292 (6th Cir. 2016).

The district court did not abuse its discretion in ordering Black to repay $150,422.53. Jack Dietz, the contractor who investigated Black's fraud, prepared a spreadsheet tracking the expenditures from the Trust's account and noting his findings about which expenditures were illegitimate. According to Dietz's calculations, Black embezzled $178,372.53 from the Trust. Dietz testified that Black repaid the Trust $26,750 after Dietz began investigating him. This payment reduced the loss amount to $151,622.53. The district court later reduced this amount by another $1,200 (to the final $150,422.53 amount) because it disagreed with Dietz's finding that a check Black had written for repair work at Sharon's home was illegitimate.

Black fails to show any error. He first suggests that the district court wrongly relied on Dietz's testimony, arguing that Dietz was biased because he was paid by the government. But district courts may "hear testimony" when deciding on restitution amounts, 18 U.S.C. § 3664(d)(4), and other courts have relied on loss summations from government agents when upholding restitution orders, *see, e.g.*, *United States v. Fennell*, 925 F.3d 358, 360–61, 362 (7th Cir.

2019); *United States v. Seignious*, 757 F.3d 155, 158–59, 162 (4th Cir. 2014). In response to Black's suggestion that Dietz was biased, moreover, the district court reasonably countered that Dietz "prepared the spreadsheet based on facts admitted into evidence at trial, not his own interpretation or opinion about the facts."

Black also suggests that Dietz calculated the "loss" for a non-restitution purpose—to identify the loss amount under the Sentencing Guidelines for determining Black's sentence. He adds that this amount may sometimes vary from the loss amount for restitution purposes because the methods for calculating the two types of losses are different. *See United States v. Gossi*, 608 F.3d 574, 578–82 (9th Cir. 2010); *see also United States v. Cox*, 665 F. App'x 457, 462 (6th Cir. 2016). But he does not explain why Dietz's spreadsheet violated any legal principle for calculating a victim's loss under the Mandatory Victims Restitution Act. That Act requires a district court to impose "the full amount" of the victim's loss as restitution. 18 U.S.C. § 3664(f)(1)(A). And Dietz's spreadsheet identified the full amount of the Trust's loss.

Black next attacks a few expenditures that the district court treated as part of the fraud (amounting to less than $5,000 of the $150,422.53 restitution order). Black ignores the district court's responses to each of his complaints. He notes, for example, that two checks (one for $600, the other for $300) stated on their memo lines that they were for repair work or yard work at Sharon's home. Yet the district court reasonably concluded that these checks were part of the fraud because "there were just no receipts to substantiate the expenses noted on" them. As the court explained, "there were many, many instances" in which Black wrote a check ostensibly for valid purposes but used the money for something else. To give another example, Black challenges the inclusion of a $1,200 expense that he says was for a legitimate repair. He overlooks that the district court subtracted this very $1,200 expense from its loss amount. Black also argues that he

used one check for $915.05 to buy back items that Sharon's husband had pawned before his death. Here again, Black ignores the district court's response that Black did not return these items to Sharon. All told, none of Black's nitpicks of the restitution order shows an abuse of discretion.

Black finally argues that the Mandatory Victims Restitution Act authorizes district courts to forgo imposing the otherwise mandatory restitution award. The Act permits this exception if the district court "finds, from facts on the record, that" "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B); *United States v. Kilpatrick*, 798 F.3d 365, 388 (6th Cir. 2015). Black did not meet that standard. As the district court noted, Black "raised particular objections" to only "a few of the specific amounts included in the government's restitution calculation," and the court could "easily" resolve those objections without "unduly burden[ing] the sentencing process."

We affirm.