**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0481n.06

Case No. 19-3076

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|   |   |   |
|---|---|---|

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ARVEL HENDERSON, II,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Aug 14, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

**O P I N I O N**

---

**BEFORE: MOORE, CLAY, and McKEAGUE, Circuit Judges.**

**McKEAGUE, Circuit Judge.** Arvel Henderson, II played a key role in a scheme to sell bonds that no one in the deal ever had authority to sell. That scheme was crafted by Mark Wittenmyer, an accomplished fraudster whom the FBI had been investigating for years. Henderson and Wittenmyer managed to convince someone to wire them a $500,000 commission for this deal, which they promptly spent on expensive clothes, resorts, and a trip to Las Vegas. Afterwards, Henderson was indicted for and convicted of conspiracy to commit money laundering as well as engaging in monetary transactions with criminally derived property.

Henderson appeals those convictions, claiming four errors with the proceeding below: a *Brady* violation, prosecutorial misconduct in closing arguments, insufficient evidence of venue,

and insufficient evidence of guilt. We find these arguments without merit and **AFFIRM** Henderson's convictions.

**I**

Henderson first met Wittenmyer in late 2011 when Wittenmyer was planning on purchasing a home in Sylvania, Ohio for $1.7 million. Henderson was a real estate agent working for RE/Max in Toledo, Ohio at the time. The FBI had been investigating Wittenmyer for various financial crimes since 2008, and this potential real estate transaction drew the FBI's attention because Wittenmyer had not earned any legitimate income for the past seven or eight years and was using money he obtained illegally during that time.

Wondering just how Wittenmyer could afford an expensive home, FBI agent Eric Robinson met with Henderson and several other RE/Max representatives on April 17, 2012 regarding the proposed sale. Henderson told Robinson that the $1.7 million was coming from a group called RM Capital, which Robinson knew was a shell company that Wittenmyer had recently used to illegally obtain $85,000. Robinson explained this information to Henderson and the RE/Max representatives and confirmed that Wittenmyer and other individuals from RM Capital were using stolen money. Afterwards, the RE/Max representatives told Robinson they did not want to be involved with the deal and had concerns about its fraudulent nature. Henderson had a different idea. Henderson was upset that he might lose out on a "premium commission" of almost $100,000 if the deal did not go through, even though Robinson explained the FBI would seek to forfeit any money that came from RM Capital. Undeterred, Henderson decided to continue with the sale, and so RE/Max returned Henderson's real estate license to the Ohio Division of Real Estate.

On December 22, 2012, Wittenmyer was arrested at Henderson's home and charged with fraud in an unrelated transaction, which was later incorporated into the federal indictment in this

case. Henderson posted Wittenmyer's bond and told the bail bondsman he expected to make a substantial amount of money on the sale of a house to Wittenmyer. Unfortunately for Henderson, Wittenmyer never bought the house.

But Henderson was still seeking that premium commission. In 2013, Wittenmyer facilitated an agreement where a company called Creative Global Consulting would purchase three Freddie Mac bonds and then sell them to a shell company, CL Trust Management, which would then sell the bonds to another buyer, the Panchine Group. Wittenmyer told the Panchine Group that Creative Global Consulting already owned the bonds. The bonds had a face value of $100 million, and so Wittenmyer's commission would be one percent (or $1 million). While Creative Global Consulting had multiple conversations with a bond broker, the company never opened an account or attempted to purchase any bonds. Henderson was necessary to this scheme according to Wittenmyer because he told Henderson he couldn't have the commission paid directly into his account as he brokered the deal, and so the plan was for the commission to be deposited into Henderson's FTL Properties business account.

Wanting a third associate, Wittenmyer reached out to Ira Brody to assist him with the bond deal. Wittenmyer knew Brody because Wittenmyer asked Brody for a seven-day loan to close a financial deal in 2012. Brody loaned him the money, but Wittenmyer had not paid Brody back by the time of the bond deal. So, Brody agreed to participate in the bond deal because he was still hoping to get back what he loaned Wittenmyer. Because no one was willing to pay the million-dollar commission for the bond deal, Brody wrote threatening letters to the involved parties claiming that liens would be placed on the bonds if the commission was not paid (rendering them

unsellable).  The owner of CL Trust Management eventually grew skeptical and withdrew from the deal.

Recognizing that one million dollars was not coming, Wittenmyer and Henderson decided half was better than none and agreed to accept $500,000 instead.  Brody told Wittenmyer and Henderson that he was willing to process the $500,000 commission through his business but would tell Robinson about the transaction.  Unsurprisingly, Wittenmyer and Henderson didn't like that idea, and accepted the $500,000 commission into Henderson's FTL Properties account on November 8, 2013 directly from P.L., a different buyer who had been contacted by the Panchine Group.  A representative from the Panchine Group promised P.L. that he would get his $500,000 back within a week or two and then another $500,000 shortly thereafter, but he never received any money.

After getting the commission that he wanted, Henderson began spending the $500,000 as rapidly as he could.  No better place to do that than South Florida; Henderson spent thousands at Louis Vuitton, Neiman Marcus, Joe's Stone Crab, the Art of Shaving, Hertz, and various hotels, as well as transferring thousands to his personal account.  Henderson and Wittenmyer also took a trip to Las Vegas at the end of November 2013, spending tens of thousands on hotels and gambling.  By the time Brody learned about the $500,000 deposit in late November or early December, Henderson told him almost all the money had been spent.

During the midst of Henderson's spending spree, Robinson learned about the $500,000 wire transfer and contacted Henderson about it on November 20, 2013.  Henderson said he didn't know anything about the wire transfer and had simply loaned Wittenmyer some money. The FBI's subpoena of Henderson's bank records for FTL Properties told a different story, revealing the

$500,000 wire transfer as well as showing a stark difference between Henderson's normal spending habits and his spending when the closing for the bond deal began.

On June 3, 2015, in the United States District Court for the Northern District of Ohio, Henderson was charged with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and five counts of engaging in monetary transactions with property derived from a specified unlawful activity, in violation of 18 U.S.C. §§ 1957 and 2. The government dismissed one of the counts before trial. Additionally, Henderson was charged with bankruptcy fraud based partially on his failure to declare the $500,000 commission on his list of assets. *See United States v. Henderson*, 3:16-CR-285 (N.D. Ohio 2016).

The government, over Henderson's opposition, sought to consolidate the two cases, given that they involved the same defendant, the same bank accounts, and the same business entity. The district court denied the motion, finding that the overlap between the money laundering charges and bankruptcy fraud was minimal and the potential for prejudice was too great. The trial on the money laundering charges began on February 20, 2018, and on February 23, 2018, Henderson was found guilty on all five counts.

On January 10, 2019, one day before his sentencing, Henderson filed a motion to continue, claiming a *Brady* violation because the government failed to produce relevant discovery in the bankruptcy fraud case involving anonymous complaints and emails to the bankruptcy trustees, and arguing that the discovery would have changed his trial strategy in this case. These emails allegedly revealed that the bankruptcy trustee treated Henderson's bankruptcy petition as a criminal referral and that the United States Trustee's Office may have thought Henderson's bankruptcy counsel was involved in the suspected fraud. The district court proceeded with the

sentencing hearing the following day and addressed the motion to continue, denying Henderson's motion. This appeal followed.

Henderson claims four errors in the money laundering proceeding below. First, Henderson claims that after the trial was over, he became aware of potential *Brady* evidence from his bankruptcy fraud case, and that this should have resulted in the district court granting his motion to continue sentencing. He claims that this would have changed his trial strategy for the money laundering trial, including whether he would oppose consolidation with the bankruptcy fraud proceeding and whether he would have testified at trial. Second, Henderson claims that the prosecutor's comment in closing argument regarding his decision not to speak with the FBI was an improper and unconstitutional comment on his silence. Third, Henderson claims that the jury was not given sufficient evidence to find that venue was proper in the Northern District of Ohio. And finally, Henderson claims that the evidence at trial was insufficient to prove that he knew the $500,000 commission was criminally derived.

## II

### A. Brady *Violation*

Henderson argues that the district court erred when it denied his motion to continue sentencing on the basis of potential *Brady* material produced in his bankruptcy fraud case. He claims that this discovery would have affected his decisions about trial strategy for the money laundering case, including whether he would testify and whether he would support consolidation of the two cases. The denial of a motion to continue sentencing is reviewed for an abuse of discretion. *United States v. Williams*, 471 F. App'x 497, 498 (6th Cir. 2012) (per curiam) (citing *United States v. Warshak*, 631 F.3d 266, 298 (6th Cir. 2010)).

The potential *Brady* evidence in this case is a set of communications and emails between the United States Trustee's Office, Henderson's civil attorneys, and an anonymous complainant. The emails suggest that the United States Trustee's Office was treating Henderson's bankruptcy petition as a criminal referral and that Henderson's bankruptcy counsel might also be implicated in the suspected misconduct. Importantly, whether a *Brady* violation occurred in Henderson's bankruptcy fraud case is not before us. We are reviewing only whether the district court abused its discretion in not granting Henderson's motion to continue sentencing in the money laundering case.

And here, the core problem with Henderson's argument is that he cannot show any potential *Brady* violation that occurred should have impacted the district court's decision on whether to continue his sentencing. His money laundering trial had already taken place. The bankruptcy fraud charge was not mentioned at trial at all. His civil bankruptcy attorneys were not involved. And any potential misconduct by either Henderson's civil bankruptcy attorneys or the United States Trustee's Office could not impact whether Henderson's sentencing for the entirely separate money laundering trial should be continued. The purported *Brady* evidence was related only to Henderson's bankruptcy trial, and its disclosure had no impact on the sentencing for Henderson's money laundering convictions. The material is not relevant to Henderson's money laundering trial, and therefore there was no reason to delay Henderson's sentencing.

Henderson argues to the contrary, claiming that had the information been disclosed earlier, it may have affected his trial strategy, his decision to testify, or his decision to oppose consolidation of the two trials. But Henderson fails to explain how that could be so. Whatever the relevance of the information to his bankruptcy fraud case, it is hard to see how it could be exculpatory, impeaching, or even relevant to this one. The district court had no reason to delay sentencing in

Henderson's money laundering case, and it wasn't an abuse of discretion for the court to deny Henderson's motion to continue.

B. *Prosecutorial Misconduct*

Henderson argues that when the government compared his actions with those of Brody in its closing argument, it violated his right against self-incrimination by invoking his "silence" in not speaking with the FBI about the bond deal. Henderson raised this prosecutorial misconduct issue in his motion for a new trial, and the review of the denial of that motion is for abuse of discretion. *United States v. Wettstain*, 618 F.3d 577, 588 (6th Cir. 2010).

We review allegations of prosecutorial misconduct in two steps: first, we determine if the statements were improper, and if so, we determine whether they were flagrant enough to warrant reversal. *United States v. Wells*, 623 F.3d 332, 337–38 (6th Cir. 2010). Prosecutors receive "'wide latitude' during closing argument and any challenged remarks are evaluated in the context of the trial as a whole." *United States v. Lawrence*, 735 F.3d 385, 431 (6th Cir. 2013) (quoting *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011)). This is a demanding standard, and "[t]o warrant reversal, the prosecutorial misconduct must have rendered the trial fundamentally unfair." *Id.* at 431–32.

In closing arguments, the government compared the actions of Brody and Henderson. The prosecutor stated:

> But what did Ira Brody say about his knowledge of Mark Wittenmyer? He got warned too. He said, "Well, you know, Mark Wittenmyer wasn't indicted, wasn't convicted at the time." But he changed the way he treated Mark Wittenmyer. He

said, "If I'm going to get money, I'm going to call the FBI first[."] [N]ot Ray Henderson.

R. 460, PageID 5749.

Brody had decided to tell the FBI if the commission from the bond deal was transferred into his account. Henderson claims that the prosecutor's comment violated his Fifth Amendment right against self-incrimination because it suggested that citizens have an obligation to report their involvement in potentially criminal activity to the government and that Henderson's failure to do so was evidence of guilt.

Whether the government was commenting on Henderson's failure to report his involvement in criminal activity or merely comparing the actions of Henderson and Brody is a close question, but we need not answer it. Even assuming (without deciding) that the comment was improper, it can be grounds for reversal only if it was flagrant, and this comment was clearly not flagrant. Four factors guide this determination: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Lawrence*, 735 F.3d at 432 (quoting *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009)). An isolated remark in a lengthy closing argument, in a case supported by strong evidence, cannot serve as a flagrant comment worthy of reversal.

C. *Other Challenges*

Henderson makes two other arguments for reversal of his convictions below. First, he claims that the jury was never given any evidence allowing them to determine that venue was proper in the Northern District of Ohio. Henderson didn't raise this issue below, either before trial or in his motion for judgment of acquittal. "[O]bjections to defects in venue are usually [untimely]

if not asserted before trial" unless "the defect is not apparent on the face of the indictment." *United States v. Grenoble*, 413 F.3d 569, 573 (6th Cir. 2005) (quotations omitted). However, in those situations, the defendant still must preserve the claim for appellate review by either making a general motion for judgment of acquittal or specifically raising the venue objection at the close of evidence. *United States v. Ramer*, 883 F.3d 659, 682 (6th Cir. 2018).

Henderson correctly notes that any potential defect in venue was not apparent on the face of the indictment, which allowed him to raise the challenge after trial. However, he forfeited this claim for appeal because he filed a motion for judgment of acquittal at the close of evidence that listed specific objections to the government's case but did not challenge venue. Because Henderson listed some specific objections in his motion, he forfeited all arguments not made. *Ramer*, 883 F.3d at 682 (holding that a motion that raises specific objections is not "a general challenge to the government's proofs" and that "such a motion will [forfeit] all other grounds not specified in the motion" (citing *United States v. Dandy*, 998 F.2d 1344, 1356–57 (6th Cir. 1993))). Thus, he forfeited any venue objections.

Finally, Henderson challenges his conviction for conspiracy to commit money laundering on the ground that there was insufficient evidence that Henderson knew the transaction involved criminally derived property. Henderson need not have known that the $500,000 was criminally derived; instead, showing that Henderson remained deliberately ignorant of its nature can also satisfy this element. *See United States v. Bowser*, 787 F. App'x 853, 855–56 (6th Cir. 2019).

Henderson raised this issue in his motion for judgment of acquittal, which we review de novo. *See United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016). In assessing sufficiency of the evidence, the test is "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Henderson offers a lengthy list of evidence that purportedly fails to prove that Henderson knew the $500,000 was criminally derived. But Henderson's attempt to poke holes in the evidence by attacking it piece-by-piece fails. The evidence must be looked at as a whole and must be viewed in the light most favorable to the prosecution. *Id.* Here, the evidence is more than sufficient to uphold the conviction. Before the bond deal even began, Henderson was told by Robinson that Wittenmyer was the subject of an ongoing FBI investigation, had a long history of financial fraud, and had no legitimate income. Wittenmyer was arrested at Henderson's home on state credit-card-fraud charges. Henderson engaged in rapid, unusual spending of money after receiving the $500,000 commission in early November 2013, and then misled Robinson on a phone call later that month by claiming he knew nothing about any wire transfers. After hearing this evidence, and more, the jury convicted Henderson on all charges. "A defendant challenging the sufficiency of the evidence bears a very heavy burden." *United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000) (citation and internal quotation marks omitted). Henderson has not met that burden here.

**III**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.